## LEHIGH VALLEY R. CO. v. CIECHOWSKI.*

(Circuit Court of Appeals, Second Circuit. December 7, 1925.)

No. 100.

1. **Carriers ⬡⟾316(5)—Injury of passenger from derailment of train raises presumption of negligence.**

Injury of passenger by derailment of train raises presumption of negligence, which, in absence of explanation or proof to contrary, will sustain verdict against carrier.

2. **Carriers ⬡⟾316(5)—Doctrine of res ipsa loquitur applies, where passenger is injured by derailment of train.**

Doctrine of res ipsa loquitur applies, where passenger is injured by derailment of train, and question for jury is whether preponderance of evidence is with plaintiff.

3. **Carriers ⬡⟾301—Timely crossing signal by engineer held necessary.**

Engineer, being charged with knowledge of obstructions to view at crossing, which he saw automobilist approaching, and fact that long freight train on parallel track would put warning signal in operation and might drown signals of his on-coming passenger train, which was derailed by collision with automobile, injuring passenger in train, should have given timely crossing signal.

4. **Carriers ⬡⟾320(22)—Whether engineer used brakes timely, and automobile became entangled in locomotive, causing derailment, held for jury.**

In action for injuries to passenger from derailment of train after striking automobile at crossing, whether engineer used brakes timely and other means at his hand to stop train, and whether parts of automobile became entangled in locomotive, causing derailment, *held* for jury, on testimony of passengers and railroad employees, weight of whose testimony as interested witnesses was for jury.

5. **Carriers ⬡⟾320(22)—Whether carrier should have protected crossing by gates and flagman held for jury.**

In action for injuries to passenger from derailment of train after striking automobile at highway crossing, where railroad maintained a safety signal of type prescribed by Public Service Commission, evidence as to extent of use of both highway and railroad, and practicability of flagman or gates at such crossing, *held* to warrant submission of issue whether carrier should have protected crossing by gates or flagman.

6. **Carriers ⬡⟾280(1), 288—Greater care than in complying with requirements of Public Service Commission may be required of carrier; carrier may be required to maintain flagman and gates at crossing of much-traveled highway.**

Carrier, in protection of passenger, may be held to a higher degree of care than is exercised in complying with requirements of Public Service Commission, and may be required to provide flagman or gates at surface grade crossing at right angles on much-traveled highway, in ad-

*Certiorari denied 46 S. Ct. 352, 70 L. Ed. ——.

dition to maintaining safety signal prescribed by commission.

**7. Carriers ⊂⇒280(1)—Degree of care required of carrier stated.**

Carrier, though not insurer of passenger, must exercise that degree of care, caution, and foresight which person of great prudence, and average intelligence, experienced in business of common carrier and appreciating responsibilities arising from nature of risk, would exercise to secure safety of passengers.

Hand, Circuit Judge, dissenting.

In Error to the District Court of the United States for the Western District of New York.

Action by Barbara Ciechowski against the Lehigh Valley Railroad Company. Judgment for plaintiff, and defendant brings error. Affirmed.

Kenefick, Cooke, Mitchell & Bass, of Buffalo, N. Y. (Thomas R. Wheeler, of Buffalo, N. Y., of counsel), for plaintiff in error.

James L. Kelly and Bayard J. Stedman, both of Batavia, N. Y. (Hamilton Ward, of Buffalo, N. Y., of counsel), for defendant in error.

Before ROGERS, MANTON, and HAND, Circuit Judges.

MANTON, Circuit Judge. On May 13, 1922, the defendant in error was a passenger going from Chicago, Ill., to Freeland, Pa., on an express train owned and operated by the plaintiff in error, and was severely injured when the car in which she was riding, with others, was derailed east of the Lake street crossing near North Leroy station in New York.

The train was proceeding easterly at 60 miles an hour. Just before the derailment, an automobile came into collision with the locomotive at the Lake street crossing. The sole occupant of the automobile was killed. North Leroy station is on the main line, a few miles east of Batavia, N. Y., and crosses at grade and at right angles. There are three tracks, east-bound, west-bound, and a passing siding. The east-bound is the southerly track, the west-bound is in the middle, and the track on the north is the siding. There is an automatic warning signal of the banjo type on both sides of this crossing. It is mounted on a steel post, and in the center of the banjo is a glass disc, and a red flag drops down when the train is within ringing distance. The bell commences to ring a warning. The signal continues to operate until the last car of the train coming from either direction has cleared the crossing. This signal was in operation at the time of the collision. Lake street is a state highway and is a busy thoroughfare. The station is 455 feet east of the crossing. The station siding runs westerly from the east-bound main track, and the frog of the siding where it enters the west-bound track is 837 feet distant. There is a bridge about 1,617 feet from Lake street. A snow fence is situated along the right of way of the railroad west of Lake street, about 70 feet south from the southerly rail of the track. There is a descending grade in the vicinity of Lake street. The drop is about 20 feet from Lake street to a point about one mile east of Lake street.

The traveler upon the highway approaching the railroad tracks, going from south to north on Lake street, in the direction the automobilist was proceeding, would have a view which would be somewhat obstructed by the snow fence. This fence was about 311 feet long. There is a rise in Lake street proceeding toward the crossing. The automatic type of signal used at the crossing was prescribed by the Public Service Commission. About the time the automobilist was crossing, a freight train of 80 cars passed in the opposite direction from which the train which struck him was coming. It had just about passed the crossing. There was a rumble of the cars of this passing train, which may have drowned out the signals for the crossing which it is claimed were given by the on-coming passenger train. An automobilist, intending to cross to the opposite side of the track, said he did not hear the warning signals. The passing freight train would also put in operation the crossing signals and exhibit the red light of danger.

After the collision with the automobile, the small wheels of the locomotive left the track and the train went about 1,800 feet to half a mile before stopping. The engine remained upright, but off the track, and some of the cars went over the embankment at various angles; the car in which the defendant in error was seated among them. There is evidence that parts of the automobile became stuck firmly under the locomotive, and marks of the gouging out of the bed of the railroad were found. Plaintiff in error claims that the derailment of the cars was brought about through no fault of it, but was due to the collision of the automobile, and that the latter was solely at fault for the collision with the locomotive. The

defendant in error's claim of negligence is that the engineer failed to operate the train carefully and was in part at fault for the collision at the crossing; also that the plaintiff in error was guilty of negligence in not maintaining gates or flagman at this crossing. These respective claims were submitted to a jury and the verdict returned in favor of the defendant in error.

[1, 2] It is argued here that the court should have directed a verdict for the plaintiff in error, and that error was committed in permitting a recovery to be had upon the theory that it was negligent in failing to have a flagman or gates at the crossing. Where a passenger is injured by the derailment of the train, there is a presumption of negligence on the part of the carrier, which, in the absence of some explanation or proof to the contrary, is sufficient to sustain a verdict against it for such derailment is considered prima facie a breach of the contract to carry safely. Patton v. Tex., etc., Ry., 179 U. S. 663, 21 S. Ct. 275, 45 L. Ed. 361; Gleeson v. Va. R. Co., 140 U. S. 435, 11 S. Ct. 859, 35 L. Ed. 458; Plumb v. Richmond Light Co., 233 N. Y. 285, 135 N. E. 504, 25 A. L. R. 685. The fact of the occurrence warrants the inference of negligence, and the doctrine of res ipsa loquitur comes into application. This means that, when the evidence is all in, the question for the jury is whether the preponderance is with the plaintiff. The explanations made, especially if given by interested witnesses, are for the jury. Chicago v. Irving, 234 F. 562, 148 C. C. A. 328.

The danger of collisions at crossings and the danger resulting from derailments must always be considered by those in charge of the transportation of passengers. The management and control of the transportation is wholly confided to the employee of the railroad company, and the passenger cannot be expected to be on the watch, either as to its management or as to dangers from collision. Therefore, when a derailment occurs, there arises a presumption of negligence on the part of the carrier. This presumption arises because of the duty of the carrier to exercise the highest degree of care in the management and operation of its trains. It is required to exercise that degree of care and skill to avoid the accident which human prudence and foresight should have suggested under the circumstances.

[3] If, as it is argued by the plaintiff in error, the derailment was caused by parts of the automobile becoming intermingled with the trucks of the locomotive, the question of fault on the part of the railroad company which in any way contributed to the collision at the crossing is important. The trial court let the jury say whether the engineer exercised reasonable skill and precaution to avoid the accident, exercising such skill and foresight as was commensurate with the situation, and said that, if he failed in the circumstances, his failure entitled the plaintiff to recover. That timely signal for the crossing should have been given could not be questioned. The engineer knew or was charged with knowledge of the obstructions to view at the crossing; with the fact that on a parallel track a freight train consisting of 80 empty cars would put in operation the warning signal, and might drown the signals of his oncoming passenger train, and thus confuse the automobilists on Lake street. He may have taken the warning signal as advising him of the passage of the freight train. The engineer was likewise obliged to take these facts into his calculations. He testified that he saw the automobilist approach, and he lost sight of him, and, when he next saw him, he was just coming out of the snow fence, and at that time the engineer was 400 or 500 feet away. There was the snow fence, a building, and a train proceeding in the opposite direction to obstruct his view. A witness who said he was on the opposite side of the track, intending to cross Lake street, testified that he did not hear the whistle of the locomotive.

[4] There was evidence of employees of the plaintiff in error and others who heard the signals. The engineer said he put on his brakes and tried to stop or slow down the train when he saw the automobilist four or five hundred feet away. There is testimony of passengers in the train who felt the brakes applied after the impact. Whether the engineer used the brakes timely and other means at his hand, such as the sand, to place upon the tracks, were questions of fact under this proof for the jury. They had the duty to say whether the engineer approached this crossing under the circumstances with that caution and alertness which he was obliged to, having in mind his obligation toward his passengers to exercise a high degree of care. The effort to stop the train, the caution which was exercised by those in charge of the locomotive, was given by the employees, who are interested witnesses, and the weight of their testimony was for the jury. The jury may have disbelieved the statement of the engineer as to his use of the brakes, and have found that he failed to avoid the collision, or failed in sounding

the whistle. The death of the automobilist forbids the narration of what he heard and saw. The application of the emergency brake in seasonable time after seeing the automobilist might have slowed down the train and have avoided the collision. The train proceeded 1,800 feet or more before the cars went over the embankment. The testimony as to the parts of the automobile being entangled in the locomotive and causing the derailment was given by employees of the railroad company, and it was for the jury to say whether they were honest and truthful in what they said as to this important fact. This issue was properly submitted to the jury.

[5] Error is assigned in permitting the jury to consider as a basis of negligence that the crossing was not protected by gates or flagman. When the railroad company placed another track at this crossing, it asked permission from the Public Service Commission so to do. There had been a flagman at the crossing prior to this time. No permission was granted to discontinue the flagman, but the Public Service Commission granted the permission and designated the type of signal to be erected at the crossing. This signal was erected and has heretofore been described. The crossing in question leads from the village of Leroy to and crosses this railroad. It is one of the main state roads for freight and passenger traffic. At the time of the accident, about 400 automobiles a day passed over it, and very considerable freight was unloaded at the depot and had to cross the same way. There were about 36 trains passing daily. It is not questioned but that a flagman or gates was practical at this crossing. In addition to showing that the gates were practical, there was proof competent to aid the jury in saying what constituted care. It was shown that the flagman or gates were used at similar crossings on this division and would be practical at this point.

[6, 7] The plaintiff in error here may be held by the jury to a higher degree of care than that exercised in complying with the requirements of the Public Service Commission. A duty may exist apart from such requirement. The duty to provide a flagman or gates or adequate warnings and appliances, if the situation at the crossing reasonably required them, depends upon the rule that the railroad company, carrying passengers over crossings frequently traveled, must exercise the highest degree of care to avoid collisions at such crossings. Surface grade crossings at right angles on a much-traveled highway, may require such care and caution on the part of the railroad company as to make necessary gates or providing a flagman. Grand Trunk Ry. v. Ives, 144 U. S. 408, 12 S. Ct. 679, 36 L. Ed. 485. All human factors are involved and should be considered in the exercise of this high degree of care. While the duty owed to the passenger is not that of an insurer, it requires the carrier to exercise that degree of care, caution, and foresight which a person of great prudence experienced in the business of common carrier would exercise in order to secure the safety of its passengers. Pittsburgh Rys. Co. v. Givens, 211 F. 885, 128 C. C. A. 263. This carrier was responsible to the defendant in error for her safety, so far as the exercise of human prudence, caution, and foresight could secure it, and this, of course, must be tested by what a man of average intelligence who appreciates the responsibilities cast upon him by the nature of the risk of the business would exercise.

Changes in population and the very growing use of the automobile, using the highways, are matters which a railroad company must consider, and which a jury may consider, in determining the full extent of the obligation of the company. Memphis Co. v. Bobo, 232 F. 708, 146 C. C. A. 634. The jury had before it the order of the Public Service Commission, the state of traffic at this crossing, the frequency of passing trains, the obstructions to view at the crossing, and the fact that there was no flagman stationed at the crossing and no gates maintained. These factors were proper for them to consider in determining whether public safety and common prudence dictated that, for the care of passengers on its train, the railroad company should not have maintained a flagman or gates at the crossing.

We have examined other errors assigned, and deem further discussion as to them unnecessary. No error appears.

Judgment affirmed.

ROGERS, Circuit Judge. I concur. The obligation of the railroad to its passengers rests upon contract, but its obligation to persons who have occasion to use a highway which crosses its tracks does not rest upon contract. A person riding on a railroad train is helpless to protect himself, and his safety must depend upon the care the company exercises for his protection; and the courts of the United States have very properly held that the railroad company must answer in damages to a passenger being carried on one of its passenger trains,

and who is injured by the failure of the company to afford him such degree of care as the nature of the business it is engaged in requires of it.

The rule laid down by the Supreme Court of the United States is that a carrier of passengers, a steam railway, is bound to exercise the utmost care and diligence, or the highest degree of care, prudence, and foresight, for the safety of the passenger. In Philadelphia & Reading Railroad Company v. Derby, 14 How. 468, 14 L. Ed. 502, the court declared that, when carriers undertake to convey persons by the powerful agency of steam, public policy and safety require that they be held to the greatest possible care and diligence.

In Stokes v. Saltonstall, 13 Pet. 181, 10 L. Ed. 115, the court, affirming Chief Justice Taney on the circuit, said that, although the carrier does not warrant the safety of the passengers, at all events, yet his undertaking and liability as to them go to the extent that he, or his agents, where he acts by agents, shall possess competent skill, and "as far as human care and foresight can go he will transport them safely." This was later approved in New Jersey R. & Transp. Co. v. Pollard, 22 Wall. 341, 22 L. Ed. 877, in an opinion written by Chief Justice Waite. And in Pennsylvania Co. v. Roy, 102 U. S. 451, 26 L. Ed. 141, Justice Harlan, after referring to the decisions of the court, went on to say that they "show that the carrier is required, as to passengers, to observe the utmost caution characteristic of very careful, prudent men. He is responsible for injuries received by passengers in the course of their transportation which might have been avoided or guarded against by the exercise upon his part of extraordinary vigilance, aided by the highest skill."

In Gleeson v. Virginia Midland R. Co., 140 U. S. 435, 443, 11 S. Ct. 859, 862, 35 L. Ed. 458, the court said: It is the "settled law in this court that the happening of an injurious accident is in passenger cases prima facie evidence of negligence on the part of the carrier, and that (the passenger being himself in the exercise of due care), the burden then rests upon the carrier to show that its whole duty was performed, and that the injury was unavoidable by human foresight."

And in Pennsylvania Co. v. Clark (C. C. A.) 266 F. 182, 188, the Circuit Court of Appeals in the Sixth Circuit said: "The jury were told that 'the carrier is liable as to passengers to observe the utmost caution characteristic of very careful and prudent men'; also that it was responsible for injuries received by a passenger 'which might have been avoided or guarded against by the exercise upon the carrier's part of extraordinary vigilance, aided by the highest skill'; and again this due care was defined as 'the highest possible degree of care, aided by the highest skill and performed with the utmost diligence upon its part and upon the part of its employees.' This instruction was well within the authorities."

See, also, Memphis St. Ry. Co. v. Bobo, 232 F. 708, 711, 146 C. C. A. 634.

Shearman & Redfield on the Law of Negligence (6th Ed.) vol. 2, § 417, p. 1028, speaking of railway companies crossing highways, says: "The company is not bound, as matter of law, to erect signs and station flagmen to give signals at crossings, but the jury may find, in view of the danger and difficulty of a particular crossing, that it was negligence to omit such precautions." And in a footnote it is said that "whether failure to provide gates, lights, or flagmen is negligence is generally held a question for the jury."

It has been held that the fact that a municipal ordinance requires a flagman to be stationed at all street crossings is competent evidence bearing upon the question of the company's negligence under the circumstances. See McGrath v. N. Y. Central R. Co., 63 N. Y. 522; Pittsburgh, etc., R. Co. v. Yundt, 78 Ind. 373, 41 Am. Rep. 580; Eichorn v. New Orleans, etc., Ry. Co., 112 La. 236, 36 So. 335, 104 Am. St. Rep. 437.

The court in its charge to the jury properly instructed that, because of the contract of transportation, it was the understanding that the plaintiff should be safely transported. The jury was correctly told that from the mere occurrence of the accident and the consequent injuries inflicted upon the plaintiff a presumption of law arose that defendant had not exercised due care, and that the burden rested upon the defendant to show that it performed its entire duty, and the accident was not occasioned by its failure to do its full duty. The jury was also properly charged that defendant did not insure the absolute safety of the plaintiff under and by virtue of the contract of transportation.

But the court's charge as to the failure of defendant to maintain at this crossing a gate or a flagman has been strenuously insisted upon as a most serious and prejudicial error, one making necessary the reversal of the judgment. Before expressing my opinion on this question, upon which this court is divided, I desire to direct attention to the circumstances and to the exact language of the charge.

Leroy, where this accident happened, is a village of some 5,000 inhabitants, with 2,000 more in its immediate vicinity. The highway commissioner estimated that the average number of automobiles which passed over this particular crossing each day numbered at least 400. The defendant's division superintendent, in charge of that part of the road where the accident happened, testified on cross-examination as to the number of trains a day that passed over this crossing, as follows:

"Q. So that the traffic that goes both to New York and Philadelphia from Buffalo, and to Buffalo, passes through this place? A. Over the Lehigh Valley; yes, sir. * * *

"Q. Yes, about how many trains a day? A. About 7 passenger trains each way a day, 6 or 7—yes, I guess there was 6 at that time.

"Q. Some of those were local and some of those were express trains? A. Yes, sir. * * *

"Q. And about how many trains a day at this time was your freight movement? A. Oh, I would say, each way, dozen trains a day.

"Q. So that there were about 36 trains a day for your total movement over that crossing? A. Yes; that is, on the three tracks.

"Q. Yes, sir. A. Yes, sir."

The highway which crosses the tracks is one of the main roads of the county. The testimony tended to show there was some obstruction of the track, due to the construction of a snow fence, which began about 70 feet away from the crossing and was some 6 feet high. At the time this accident occurred no flagman and no gates were used at the crossing. But the testimony tended to show, and it was admitted over objection, that for possibly 15 years prior to the installation of the disc sign system the defendant company had kept a flagman stationed at this crossing. In 1913, however, the Public Service Commission of the state entered an order permitting the defendant to lay a third track at this crossing, which permission was granted on defendant's petition asking therefor. The order granting permission was upon the following express conditions:

(1) That within 30 days after the date of the order the defendant would file a petition for the elimination of the grade crossing.

(2) That the defendant would install at the crossing until it was eliminated "an automatic and visible signal, operated by approaching trains in such manner that it will give notice to the public of arriving trains at all times."

The automatic and visible signal was installed. The flagman was withdrawn, but it does not appear that it was done under any authorization from the commission. Counsel for defendant insisted that, as it had complied with the commission's order to install this automatic signal system, no question could be raised because of the failure to have a flagman at the crossing. The matter was fully argued before the trial judge. He declined to be bound by the theory of defendant's counsel that it was for the Public Service Commission alone and conclusively to determine what protection was to be given by a railroad at its crossings. In so deciding I must say I think he was right. His charge on this point is found in the margin.[1]

And it has been held that the voluntary

[1] "It is charged that it was negligent in not properly and adequately protecting this crossing by the use of a gate or flagman. And I think it becomes important for you to consider whether at this crossing, Lake street, such protection was required in order to give the protection to the plaintiff that the law required. Defendant's contention on this point is that no gate or flagman was required, since they had maintained at the crossing and near to the tracks an automatic and visible signal, electrically operated by approaching trains, which gave notice of the approach of the trains to the crossing, and that such signals were maintained pursuant to the order of the Public Service Commission of this state. I think that this evidence was properly received and is an item for your consideration and bears upon the question of whether the plaintiff was given complete protection. There is testimony in opposition tending to show that about 400 automobiles or vehicles of one kind or another passed over that highway in 24 hours. And there is testimony by the highway commissioner, I think, or a witness who formerly was highway commissioner, to the effect that such is the fact; and also testimony was given by one of the witnesses, a railroad employee, I think, that about 30 trains passed over this crossing in 24 hours. And these are circumstances and elements which you should take into consideration in considering the question as to whether, in the exercise of proper degree of care, additional protection should have been added there at the crossing in the way of a gate or a flagman.

"Upon that subject I instruct you that there are times when a defendant railroad company is required to keep a flagman or maintain a gate at a crossing, even at a country crossing; that it depends whether the view of the track was obstructed, whether flagmen or gatemen should be maintained or not, or whether there was a hindrance to perceive the approach of trains, or whether, in fact, the crossing was more than ordinarily hazardous, or when it is shown that the crossing is a much-traveled one, or if used for switching operations, which renders it difficult—and I might state in passing there is no evidence here tending to show that this particular crossing, or the tracks at

establishment of gates at a crossing is evidence of their necessity. State v. Boston, etc., R. Co., 80 Me. 430, 15 A. 36. In the instant case the evidence showed that for possibly 15 years the defendant had kept a flagman at the crossing, this being prior to the installation of the disc signs in use at the time of the accident, and which had been installed by permission of the Public Service Commission of the State of New York. It is evident that this was not an unimportant country crossing; and while undoubtedly there are crossings in country districts so little used that it would be improper for the court to instruct the jury that it should consider whether the failure of the railroad to maintain a flagman or a gate at that particular crossing was or was not negligence, this crossing was not of that class.

I fully agree with the statement in Evans v. Erie R. Co., 213 F. 129, 129 C. C. A. 375, in which Judge Knappen, speaking for the Circuit Court in the Sixth Circuit, said: "The Ohio statute does not provide that compliance with crossing signals by way of bell and whistle shall excuse a railroad from taking other precautions, even to the extent of providing gates or a watchman, provided the situation be such that common prudence and due regard for the safety of travelers at the particular place and time require such further precautions; and, as a general rule, whether such care and prudence require gates or flagmen at a given crossing, as being especially dangerous, is a question of fact for the jury, under all the circumstances of the case. * * * A jury, however, would not be warranted in saying that a railroad company should maintain these extra precautions at ordinary country crossings."

The crossing where this accident occurred clearly was not of that class. It may not have been a crossing where, in view of the system installed, safety required that the defendant should have in addition either a flagman or a gate; but the plaintiff, in my opinion, was entitled to have the jury pass upon that question as one of fact, upon all the circumstances of the case. If a jury is incapable of deciding that question fairly and without prejudice, then there is something fundamentally wrong with our judicial system.

HAND, Circuit Judge (dissenting). I think that it was error to submit to the jury the issue of whether the defendant should have maintained a flagman or gate at this crossing. The plaintiff argues that, even if there be no such duty to wayfarers, there is one to passengers, since the standard of care is severer. Just the opposite is true, not, of course, because the duty to passengers is not in general more strict, but because the danger is far less probable. I do not, of course, know how often a train is derailed by a wagon, or a motor car, or indeed whether this case is not unique. But we have the right, I think, to draw on our experience to say that in the enormous majority of cases, where there is a collision, the train escapes. If derailment be a danger against which the highest foresight should provide, it ought to have been proved. Prima facie we do not know it, and the jury had no right to assume it. The case was submitted as though the danger to passengers was on a footing with the danger to persons crossing, which appears to me a very serious confusion of a railroad's duty in such cases.

But I go further, and think that even towards wayfarers the defendant owed no duty to maintain a flagman at the crossing. Concededly the rule in New York is otherwise, and to hold the defendant we must proceed under federal decisions. I agree that we should do so, because this is a piece of the customary law of New York, and not of its

---

the crossing, were used for switching purposes —or where there is uncommon amount of noise, and difficulty arises in hearing the approach of trains, or, in short, if conditions exist which make it difficult to hear the signals or whistles or the bell which are blown or given to herald the approach of a train.

"In addition to what I have said in respect to the trains advanced by the defendant, you will recall there is testimony tending to show that there was some obstruction of the track, a snow fence being maintained higher than the track, and about 70 feet therefrom. And you will also bear in mind the amount of travel over that highway, to which I referred a moment ago. The question is, therefore, submitted to you as one of fact as to whether at this crossing protection should have been given in the way of gates or a flagman, whether in the exercise of proper care and precaution there should have been a flagman or gates at the crossing to prevent collision at the crossing.

"I also instruct you, gentlemen, that inasmuch as the accident occurred on a country road, a flagman or gates were not required at the crossing, if you conclude from the evidence that but few persons and vehicles comparatively passed each day, or if you conclude that the locality and circumstances were such that the automatic bell signals, together with the signals given by the engineer, the whistle signals, were sufficient to give warning of the approach of the train to the crossing in question. Thus you will perceive, gentlemen, there are questions of fact submitted for your decision, upon which the rights of the parties depend."

statutes. The New York cases might, indeed, have made it depend upon the exclusive control over all such matters of the Public Service Commission of that state, but they have not. It was established by precedent before there was any such statute, and, moreover, in New York compliance with a statutory precaution does not absolve a railroad from its common-law duties.

But I say that under the federal cases this was not such a crossing that a jury might require for it a flagman or a gate. The first decision is Grand Trunk R. Co. v. Ives, 144 U. S. 409, 12 S. Ct. 679, 36 L. Ed. 485, which has been reaffirmed in Panama R. Co. v. Pigott, 254 U. S. 552, 41 S. Ct. 199, 65 L. Ed. 400, and followed in Evans v. Erie R. Co., 213 F. 129, 129 C. C. A. 375 (C. C. A. 6), and Murphy v. Penn. R. Co., 1 F.(2d) 929 (C. C. A. 6). The doctrine is not that a jury may pass upon the issue in every case, but only when the crossing is more than "ordinarily hazardous." The illustrations given in Grand Trunk R. Co. v. Ives, supra, are indeed not intended to be exhaustive, though perhaps they have been taken as such; but in no view do I think that the facts here fall within either the principle or the illustrations.

The travel was not unusual; 400 motors a day is by no means great to-day. People coming from Leroy to the station did not use the crossing; a highway to the east was the more used thoroughfare. Nor was the view obstructed in any sense that is not true of half the highways in any countryside. Nothing obscured it at all, except a snow fence, between the boards of which a train may be clearly seen, as the' plaintiff's own photographs disclose. Until one gets within 100 feet of the track, even that fence leaves the whole length of track to the west plainly visible, except for a short distance, about the space of two telegraph poles. If such a crossing is to be treated as within the rule, I can see no escape from saying that a jury may impose such a duty in all cases where there is the slightest obstruction to a clear view both ways. I do not believe that Grand Trunk R. Co. v. Ives, supra, meant that.

In general, it seems to me most undesirable, in a period when the duties of carriers are being more and more defined by expert commissions, to expose them, when we can honestly avoid it, to the vagaries of juries, who are obviously incompetent to consider all the elements which should enter into any adequate judgment.