## GIBSON v. SOUTHERN PAC. CO.
### No. 7144.

Circuit Court of Appeals, Fifth Circuit.
Dec. 13, 1933.

Henry T. Moore and Robert L. Holliday, both of El Paso, Tex., for appellant.

M. Nagle and Maury Kemp, both of El Paso, Tex., for appellee.

Before BRYAN, FOSTER, and HUTCHESON, Circuit Judges.

HUTCHESON, Circuit Judge.

Appellant, a cattle shipper accompanying a shipment, while riding as a passenger in the caboose of one of appellee's freight trains, was thrown from his seat in the caboose by the sudden and violent stopping of the train on the morning of March 3, 1932, as it pulled into Indio, Cal. To recover the damages caused by the injuries he claims to have received, he sued in three counts. The first two alleged a negligent stopping and a negligent breaking of the train in two, from causes known to the defendant but not to plaintiff, the train being at the time entirely in the charge and under the control of its employees. The third count alleged that the train both negligently broke in two and stopped, and set out specific grounds of negligence; that the train, consisting of one hundred cars, was too long for careful handling; that this caused it to be operated, and it was operated, in a rough and jerky manner, and it had been operated during the night before in a rough and jerky manner, thereby placing an unusual and dangerous strain on the couplers and coupling devices, causing them to break in two; that the couplings were in a weak and defective condition, and were not properly fastened; and that there was negligence in the handling of the train so as to bring it, or permit it to come to, a stop in such a violent manner.

Plaintiff testified that this was the roughest operated train he ever rode on, and in addition to the evidence of the violence attending the stopping of the train on that morning when he was injured, he testified, and in this his witnesses corroborated him, that the train had been stopping and starting throughout the night, with terrific jerks and jolts, plaintiff testifying that he had been thrown from his seat once before that night by the sudden and violent stopping, and that during the night the train had come in two at

least once. He offered the evidence of an engineer as to the manner of stopping trains. This witness testified that the longer the train was the more shocks and jolts you are going to have in it. That that was because of the slack action between cars and the draw bars and springs. That the long train makes its operation rough, and it is more difficult to handle, but that such a train could be operated without jerking, if carefully handled. Of the effect on the coupling devices between the cars of the constant jerking he said:

"There is an iron underneath that draw bar which will finally wear off, sheer off, the draw bar will come down and the train will part and break the air hose. If you are going to make a coupling the switchman would shove down on the pin with his left hand and he would have to open that knuckle with his right hand. You have got to raise that pin to open the knuckle and the other car comes in there and there is an impact against this and the pin drops. If the train is moving along on level ground and there is pressure against this knuckle you can't pull the pin. If there is slack between the draw bars and the train is moving it will open up, and if it opens up the train is uncoupled. If there is no slack you can't lift the pin. If the engine is moving six, eight or ten miles an hour ahead there will be no slack."

When plaintiff closed his testimony though he had not proved what caused the train to come to its sudden stop, he had proved that it did so, and that such stopping was not consistent with that very high duty of care in the handling of the train that as far as human care and foresight can go he will transport him safely which defendant owed him as a passenger. In short, his proof made out a strong case of negligence which, unexplained, entitled him to go to the jury if it did not demand a verdict in his favor. Chicago, M. & St. P. R. Co. v. Irving (C. C. A.) 234 F. 562; Lehigh Valley R. Co. v. Ciechowski (C. C. A.) 10 F.(2d) 82; Stokes v Saltonstall, 13 Pet. 181, 10 L. Ed. 115; Texas-Louisiana Power Co. v. Daniels (Tex. Civ. App.) 61 S.W.(2d) 179, 184.

Defendant, to rebut the case made, offered the testimony of Blake, one of its employees, a brakeman, who was to join the train at Indio, to the effect that he had walked down to the train, and was, in accordance with the duty imposed on him, making a rolling inspection of it as it pulled in, each brakeman being responsible for so many cars, and that as it rolled in some tramps were getting off a gondola car just as the cars passed him,

and he saw one of them, a young boy, come down the ladder at the end of the car, and step on the coupling pin lever, lifting the pin out so that the cars became uncoupled. Whereupon the other cars ran up on it like running into a mountain. This evidence is so important in the case that we set it out substantially in the margin.[1]

---

[1] "I was called to go on duty at 6:55 A. M. The yardmaster had told us this train was coming in the yard. I had walked down in the yard to make a rolling inspection of this train as it pulled by. Each brakeman is responsible for so many cars in the train and the rolling inspection was to watch it go by and inspect the running gears and anything we might find defective in that train so we can report it and have it fixed before the train leaves the terminal. That is what I was doing that morning.

"As the train came into the yard something happened to it. It had pulled onto the sidetrack where it was customary for trains to stop, as they change crews there. I should judge it was pulling in at about four or five miles an hour. It would have gone about eight or ten car lengths further from where I was making the inspection had it not broke in two. About eighteen or nineteen cars had gone past me when the train broke in two, parted about two feet or two and a half feet I should judge, broke the air hose, set the brakes in emergency and stopped the train.

"A T&N O gondola car broke loose. There were eight or ten trespassers in that car. These were the first hoboes I had seen on the head portion of that train. Some of these were on the end of the car getting out and the rest were in the body of the car. There was a young boy about twelve or fourteen years old got out of the end of the car. There is a ladder on the end and there is a ladder on the side and there was a man standing on the side ladder waiting to get off. This boy did not want to wait. As soon as he saw he was in the yard he was trying to get off quicker than the men were. He came down and stepped off of the end sill of the car onto the cut lever that lifted the pin and uncoupled the train. When the train uncoupled it stepped just like it ran into a mountain. I didn't pay any attention to any of the hoboes but this kid. As soon as he lit on the ground he started to run to the highway. I jumped across the train and tried to catch him, but I wasn't fast enough. The handle of the cut lever fastens to a bolt at the end of the car, and it has a piece of iron that fits up there. When you press down on this end of the lever it raises this pin lever up and pulls the pin and uncouples the train. The noise of the pin first attracted by attention. I saw the pin as it went up, and instantly the train broke. The hose was parted but there was nothing broken about it. After I saw I couldn't catch this kid I went back and turned the angle cock of the car toward the engine so that the engineer could release the brake and gave him the signal to back up and make the coupling and it coupled on impact. There was nothing wrong with the coupling. It was not in any way broken or impaired. The train pulled out later. No repairs were made on that coupler. I took the train from Indio to Colton 72 miles over the mountains. That grade is a pretty severe test on the coupling equipment of cars. The coupling device was never removed from the car while I was on the train and no repairs were ever made on it. No repairs were necessary."

On cross-examination he said: "Nobody was exactly where I was at the time I saw all of this. I was standing about three feet from where it happened, right at it. You cannot uncouple one of these cars by this device if the train is pulling. This train was in motion. Some of the hoboes ran and some did not. I did not take the names of any. I

No other witness saw what Blake claims to have seen. Other witnesses for defendant were the engineer, the conductor, and four brakemen. The engineer testified that his equipment was in good order; that he was going to stop on the side track in the yard; that he had pulled in on the track preparatory to stopping, and was going in at about four or five miles an hour; that the slack was in because he was preparing to stop, slowing the engine up; that would have a tendency to push the cars up toward the engine and put the slack in.

"It is impossible to pull the pin when the slack is out. I began to see, as I was pulling in, that I was going to stop a bit short, and I began to work steam, pull the train a little bit further. The train parted, and the brakes automatically went into emergency. We came to an immediate stop. I later received a back up signal from Blake and responded to the signal. I backed up and coupled up, pulled the train about five or six cars beyond, and stopped again."

On cross-examination he said:

"I was not working steam when this accident occurred. I did say I was going to stop a little bit short, so I began to work steam, and the minute I started to work steam the train parted. When you apply steam under those circumstances it will not break the train in two unless the pin is pulled out. The train will not be pulled in two unless there is something wrong with the cut lever. The train cannot be pulled in two unless something gives way. There might be something wrong with the coupler and pull it in two. If the jerk is hard enough something will give way. If you apply the steam correctly there is no jerk to it. If there was a jerk it was not applied correctly. There is no way you can stop these long trains without the slack being

taken up. The best way to stop a train is the easiest way. There is a way to stop a train without taking the slack, but you had better not do it because it might jerk the train in two. You can put on the brakes and work the steam and automatically you will stop and the slack will not be taken up. That is not the proper way to stop a train.

"There is more strain on the couplers and the coupling devices in a long train than a short one but the equipment carries it through."

The conductor testified to the violence of the stop, to Gibson's being thrown against the stove, and that the train was going about five or six miles an hour when it stopped; that the engineer was pulling in and he had not applied the air yet. That the train had become uncoupled twice before that night; both times it was coupled up and the train pulled on again. At both times the train was standing still. At neither time did he examine the couplers. He testified that the train was full of hoboes all night and that he would put them off whenever he saw them.

Justice, a brakeman on the cars as they came in, testified that he was about four cars from the engine looking toward the rear of the cars, and that he noticed a lot of trespassers getting out of a gondola car; that the train suddenly stopped and went into emergency. These trespassers were all going toward the highway, looked like possibly a dozen of them. "Another brakeman who was going out on that train I noticed on the engineer's side of the train, and he went through where this breaking in two was and started after these trespassers but they all got away, and he came back and closed the angle cock, coupled it up and the train pulled on in the clear. If the car is coupled the only way those cars can come apart is for the knuckle

---

am familiar with my rule book. In case of an accident we are supposed to get the names of witnesses. I did not get the names of any of these people. I did not know there was an accident. We have trains break in two every day. This does not happen all the time but quite often. The more tonnage there is the more strain there is on the coupling devices. Sometimes in case of a hidden defect or something of that kind trains are pulled in two due to the operation of the train. I was on the north side of the train, on the engineer's side, which would be usually considered the right side of the train. The boy got off on the left side the opposite from me. I saw him step on this thing; I could see across the train. While all of this was going on the train was moving just about four or five miles an hour. I could see between the refrigerator car and the other car to the opposite side of the car where he was; I even saw the pin come out; it was right in front of me. This breaking occurred right about the eighteenth, nineteenth or twentieth car from the head of the train. When there is no slack you have to press down quite hard to uncouple these cars. I would say that the boy was twelve

or fourteen years old. He was the only boy on the train, the rest were all men."

On redirect examination he said:

"The brakeman can stand on this ladder or on the end of the car and put his foot on the lever and uncouple the train. If you are on the ground you can push it down with your hand. When I made my rolling inspection of the train as it came in there was plenty of slack, in toward the engine. When the slack was in it does not require a great deal of pressure to raise that pin. There are lots of causes for a train to break in two. They break in two quite often. We have worlds of trouble with hoboes. We keep hoboes off the train if possible."

On recross-examination he said:

"The pin does not have to be in when they are pushing a car, making a flying switch and turning cars loose and pushing them down. You have to uncouple the cars, the engineer gives you the slack, and you pull the pin. He has to give you slack to get the pin. If he was pushing the cars the slack would be in, but if he was pulling them it would not be. If the engineer is going west and getting ready to stop, he can easily put the slack in."

pin to be pulled or the breaking of the knuckle. There is no other way the train can come apart."

Another brakeman testified to seeing the tramps getting out of the cars. About that time he saw the dust flying and the brakes go on. He saw Mr. Blake, the man that was going out, standing right there, saw him run through the cars to the highway, come back, give the sign to back up and couple the train up which they did and pulled on into the yard. That he could see the heads of these hoboes on this particular car pulling in the yard. Every time he saw these hoboes he had told them to get off, and he did this on this particular car a couple of times during the night. These hoboes got off, and as soon as they got them away they got right back on. Other brakemen testified to seeing hoboes on the train and to the fact that after the train broke in two it coupled up and pulled on into the yard.

Plaintiff, in rebuttal of the testimony that the cars were recoupled without delay, offered testimony that trains carry emergency couplers which could be put on in thirty seconds. This evidence was refused as having no probative effect.

When the defense evidence as to the trespassers came in, plaintiff asked leave to file a trial amendment to conform the pleading to the proof, alleging negligence in not keeping trespassers off the train so as to prevent the occurrence of accidents of the kind testified to. Leave to file was refused.

At the conclusion of all the evidence, defendant, planting itself on the proposition that it had completely overthrown plaintiff's prima facie case by showing that what caused the sudden stopping of the train was not the fault of the defendant, but the act of a trespasser unforeseen and unforeseeable, and further, that there was no defect in the coupling apparatus, moved for a directed verdict. This motion was granted and a verdict instructed.

Appellant first filed a motion for a new trial on the ground of newly discovered evidence. This motion set up that since the trial a witness, Zelnick, had been discovered who was on the gondola car in Indio when the train broke in two, and that he would testify that there was no boy of twelve or fourteen years of age on the car; that no one on the car had stepped on the lever and pulled it out, but that the train had jerked in two on account of the violent handling, before they

got off it.[2] Accompanying this motion were affidavits supporting the claim that the evidence was newly discovered and explaining its finding and proffer.

Defendant controverted the affidavits as entirely untrue, filed affidavits of two witnesses that on March 3d Zelnick was not on that train, but on a ranch in Nevada, while plaintiff controverted these by affidavits attacking the veracity of defendant's witnesses and affirming that of Zelnick.

■ We lay aside for the present the complaints appellant makes against the rulings on this trial amendment, its proffered evidence, and on its motion for a new trial, as administrative rulings constituting reversible error, only where plain injury and abuse of discretion are shown. We take up that regarding the direction of the verdict to determine whether the positive testimony of Blake demanded that the court take the case from the jury, or whether it merely made an issue to be sent along with the other testimony to the jury for their verdict.

It is not to be doubted that, if the proximate cause of the sudden stopping of the train was not its negligent handling, but an act of a stranger in lifting the pin out of the coupler which could not have been foreseen and prevented by the exercise of that very high degree of care defendant owed plaintiff, the defendant would not be liable; nor was it to be doubted that Blake's testimony, if believed, made out a complete defense if the presence of trespassers was not negligence, making the defendant responsible for their acts. For he not only swore that he saw the trespasser lift the pin and cause the cars to come uncoupled, but also that there was no defect or injury to the coupling and that upon his signaling the cars were coupled to-

---

[2] This witness said:
"While the train was running slowly about ten or twelve miles an hour it jerked in two between the gondola car in which we were riding, and the one behind it. I was standing in the southeast corner of the car nearest the ladder. We were all standing up ready to get off. All of a sudden the train started jerking and threw me against the back end of the car and then it jerked in two and threw us all forward in the car very violently. When I looked at the cars back of us I saw the cars were several feet apart. We all started climbing out of the car and the brakeman came up. He was cursing the engineer for handling the cars so roughly. There was no one standing on the ladder of the car before the train broke in two and there was no one on the refrigerator car next to our car when we climbed out; the train had already broke in two."
He testified he did not know anybody was hurt and had not heard of the accident until some time after the trial and that, when told about it and the claim made as to the cause of the train coming in two, he then told a Mr. Burris what he knew about it.

gether again by backing up and that by the same coupling devices they were pulled over a seventy-mile hard run, without any untoward happening. Upon the definite and comprehensive character of his testimony corroborated by that of other employees as to the immediate automatic recoupling of the cars, and the presence of the trespassers in the cars in question, contrary to and despite defendant's efforts to put them off, appellee puts its reliance that the instructed verdict for it was right. In short, it insists that, since no contradiction was offered, the jury were obliged to believe Blake's testimony and find the defendant without fault, while appellant insists that it was for the jury to say whether or not they did so.

■ Appellant concedes that in the federal court, and in many of the state courts, the general rule is that the uncontradicted testimony of a witness not incredible in itself, nor impeached nor discredited in any way, to plain and simple facts capable of contradiction ordinarily must be accepted as true by the jury. Mutual Life Ins. Co. v. Sargent (C. C. A.) 51 F.(2d) 4, 6; Kelly v. Jones, 290 Ill. 375, 125 N. E. 334, 8 A. L. R. 792, and that the mere fact that the witness is an employee is not in itself sufficient to change the rule. Chesapeake & Ohio R. Co. v. Martin, 283 U. S. 214, 51 S. Ct. 453, 75 L. Ed. 983; Pennsylvania R. Co. v. Chamberlain, 288 U. S. 333, 53 S. Ct. 391, 77 L. Ed. 819; Kelly v. Jones, supra. He insists that Blake's testimony "is in its nature sufficiently surprising and suspicious as to suggest doubt as to the truth of his statement." Chesapeake & Ohio R. Co. v. Martin, supra. He insists that where, as here, the plaintiff has shown rough and reckless handling of a train, not only just at the time of the accident, but for some time before it, that the coupling could have been pulled loose by jerking and that the pin could not have come out, as the brakeman testified it did, even if the boy stepped on it, unless there was slack in the cars, and that the train was pulling in at the time, and had just been given steam and that that could have pulled the cars apart if improperly applied, together with the proof that the train had broken in two twice before that night and that the train was swarming with trespassers, a plaintiff's case is not as matter of law, destroyed by exculpatory testimony of a company employee of the nature of that here offered. He argues that the providentially fortuitous arrival on the scene just in the nick of time, the fixed, penetrating, and all-embracing gaze while there of this employee, together with the meticulous attention he paid to and the photographic accuracy of his memory of the swiftly transpiring events, which in the company's defense he so positively and precisely relates, along with the confirmation of that testimony which he furnishes by his own testimony as to the automatic recoupling and the want of defects and repairs in the devices, are all matters going to his credibility, on which in the light of all the other evidence in the case as to the handling of the train and the legitimate arguments called for by it, it is for the jury and not the court to pass in determining whether the carrier defendant was at fault for injuries to a passenger.

■■ We think appellant is right that this is not a case for the rule appellee invokes. That rule, but an application of the more general one, that it is the duty of the trial judge not to submit a case to the jury where there is no evidence on which they could base a verdict, Small Co. v. Lamborn & Co., 267 U. S. 248, 45 S. Ct. 300, 69 L. Ed. 597, applies in cases where there is nothing in other evidence, nor in the tale itself, to furnish any basis for discrediting it or for fixing fault in the defendant it seeks to exonerate, and the case stands as those cases do where verdicts are instructed for the one side or the other because there is no evidence at all, or the evidence is all one way. Winn v. Consolidated Coach Corporation (C. C. A.) 65 F.(2d) 256; Frazier v. Georgia R. R. & Banking Co., 108 Ga. 807, 33 S. E. 996; St. Louis, Iron Mt. & S. R. Co. v. Landers, 67 Ark. 514, 55 S. W. 940.

■ We do not think this can be said of the evidence here. We think the very high duty owed because of the relation of passenger and carrier, in which plaintiff and defendant stood to each other in connection with the facts of this case, made it under the facts of this case a jury question whether there was more of opportunism than of truth in Blake's testimony, and whether plaintiff had made out a case.

It will serve no useful purpose to collate or discuss the authorities upon the conclusive effect of the testimony of a witness not directly contradicted. Of the multitude of them many are collected in an exhaustive note in Kelly v. Jones, supra. In some jurisdictions the leaning is toward a jury verdict. In others, against it. In the end whether a verdict should be instructed is one for the exercise of judgment, not for the mechanical application of formulae. We think that judgment was wrongly exercised here in taking the case from the jury. Chicago, M. & St. P. R. Co. v. Irving (C. C. A.) 234 F. 562;

Mitchell v. Chicago & A. R. Co., 132 Mo. App. 143, 112 S. W. 291; Kohner v. Capitol Traction Co., 22 App. D. C. 181, 62 L. R. A. 875; Gleeson v. Virginia Midland R. Co., 140 U. S. 435, 11 S. Ct. 859, 35 L. Ed. 458; Galveston, H. & S. A. R. Co. v. Murray (Tex. Civ. App.) 99 S. W. 144; International & G. N. R. Co. v. Sandlin, 57 Tex. Civ. App. 151, 122 S. W. 60; Lehigh Valley R. Co. v. Ciechowski (C. C. A.) 10 F.(2d) 82.

The judgment is reversed and the cause remanded for further proceedings not inconsistent with this opinion.