## W. S. GODWIN CO. v. INTERNATIONAL STEEL TIE CO.

(Circuit Court of Appeals, Sixth Circuit. November 3, 1924.)

No. 2024.

1. Patents ⚖️➝328—1,324,391, for paving guard, held valid and infringed.

The Godwin patent, No. 1,324,391, for a paving guard, claim 4, *held* valid and infringed.

2. Patents ⚖️➝168(2)—Patent Office reason for allowance of claim not within rule of estoppel.

The rule of estoppel does not reach the reasons given by an applicant for avoiding a reference, and the conclusion of the Examiner to grant a particular claim will be approved, if it was right, though the reason given is not sound.

Appeal from the District Court of the United States for the Northern District of Ohio; D. C. Westenhaver, Judge.

Suit in equity by the W. S. Godwin Company against the International Steel Tie Company. Decree for defendant, and complainant appeals. Reversed and remanded.

Titian W. Johnson, of Washington, D. C. (Hull, Brock & West, of Cleveland, Ohio, on the brief), for appellant.

Frederick S. Stitt, of Washington, D. C. (Day & Day, of Cleveland, Ohio, on the brief), for appellee.

Before DENISON and DONAHUE, Circuit Judges, and SATER, District Judge.

DENISON, Circuit Judge. Infringement suit on patent 1,324,391, December 9, 1919, W. S. Godwin, paving guard. The District Judge thought that the patent, while not anticipated in the strict sense, yet was invalid for lack of invention. If it is to be regarded merely as a step in the evolution of a guard for the edge of a concrete pavement, we agree; but we think the device is entitled to a more liberal view, in that it has a distinct and novel utility.

[1] Pavements have now come into very common use which are composed of at least two separately laid strata. There is a foundation composed of concrete, which is poured when wet and then permitted to set. There is also a surface applied after the foundation is hard, and very commonly consisting of a plastic material, like asphalt, which is formed under very heavy rolling pressure. The edge of this upper layer must be firmly retained under construction by a resisting form, and also must be protected after construction against injury from wheels passing over and across it. For these purposes Godwin devised an angle iron, rolled and formed so as to have, for example, a horizontal flange of three inches and a vertical one of two inches. It was made in units of considerable length. The horizontal flange was provided with anchors made by slitting longitudinal sections which remained attached to the flange at one end only and were then bent down and toward the center of the roadway. When making ready to pour the concrete, the angle iron was placed in position at the edge of the road with the horizontal flange level with the top of the foundation. When the concrete had set around the bent-down sections and the pavement was ready for the surface, the device had become firmly anchored in position and the vertical flange formed a limiting edge for the surface in the construction and remained as a permanent guard against traffic injury. It was thus at once a form for making and a guard for preserving the surface part of a two layer pavement.

While the device is simple, it seems to have had a substantial amount of use and acceptance, in substitution for concrete or stone curbs, which were the only devices formerly in use for this double purpose, and

it is thought by some competent road engineers to be cheaper and more efficient than the other method. It was the first device shown by the art to be used for this double purpose for this type of roadway, and we think it entitled to protection in that association. The nearest thing is the French patent of Freese. This was similar in a mechanical way, but it was adapted and intended for a pavement having an upper layer of wooden blocks. It had an upwardly projecting flange just high enough to catch and retain the bottom edge of the outer row of wooden blocks, to hold the pavement against expansion in hot weather. It did not serve as a retaining form, in any substantial sense, in the construction of the upper surface, nor could it serve as a protecting guard for the edge, not only because it was not high enough, but because the blocks were separated from the permanent curb only by the sealing compound poured in above the flange. It is said that there could be no invention in merely making the Freese flange higher. That would be true of itself; but there was also the change which adapted the device to have a composite retaining and protecting function not contemplated by Freese, and which we think was not obvious.

This view of the substantial merit involved in the invention is sought to be met with the suggestion that Godwin's claims are so broad as not to be confined to that compound utility in a two-layer pavement, but to extend as well to serving as a corner or edge in a completely monolithic concrete pavement, so becoming invalid for the reason first above stated. We need not decide whether claims 2 and 3 are open to this objection. Superficially they are, and yet there would be an inclination to find an ambiguity which would permit the more limited construction. The entire specification and all the claims, as drawn and as repeatedly prosecuted, called for the two-layer pavement, and as the claims were finally amended the reference therein to the two-layer pavement was omitted only because the Patent Office insisted that it must be done that way.

In claim 4 the ambiguity in this respect remains. It reads as follows: "A metallic guard for defining the longitudinal edges of roadways, said guard having an upwardly extending portion extending to the upper edge of the roadway, and forming a boundary therefor, and provided at intervals with anchors remote from the upper edge of the guard, said anchors being adapted to lock in the base of the roadway, to hold the guards in place." Reference to the base as a separate associated element clearly justifies the restriction of this claim to a two-layer pavement, and so avoids the objection last discussed, and it seems to be of no importance in this case whether claims 2 and 3 are valid; claim 4 being, in all other respects, as broad as either of them.

In its progress through the Patent Office claim 4, with others, was rejected on reference to Freese. It was thereupon amended to include the guard limitation finally found in it, "extending to the upper edge of the roadway and forming a boundary therefor," and it was pointed out that the application was distinguished from Freese by this additional limitation. It is said that since there was no invention in this mere limitation or modification, and that since the applicant rested his case thereon, he cannot now be heard to say that invention may be found elsewhere in, or in connection with, the device.

[2] The familiar rule of estoppel by Patent Office proceedings is invoked. This rule does not reach the case. The patentee may not later have such a construction of his claim that it will cover the device which has been thus protected by his confession and avoidance; but so long as he does not seek thus to broaden his claim, we do not know of any principle or authority which would bar him from claiming that his device was in fact patentable for other reasons than the one shown by his amendment. The conclusion of the Examiner to grant a particular claim, like the conclusion of an equity trial court to enter a particular decree, will be approved, if it was right, although the reason given is not sound. See Campbell Co. v. Pomeroy Co. (D. C.) 300 F. 872, 873, Learned Hand, D. J.

It seems doubtful whether any extended accounting is required. The payments made by defendant to plaintiff under their former business arrangement will doubtless apply, at the agreed rate, as compensation for the use of the patent until exhausted. The record does not show that the point of exhaustion has been reached; although the infringement suit was sufficiently justified by defendant's position, confirmed by its answer. However, the subject may not be closed in the present record, which was made as preliminary to interlocutory decree; and whether there will be an accounting will be determined by the District Court.

The decree is reversed, and the case remanded for a new decree in accordance with this opinion.·