## DIAMOND MATCH CO. v. SUN MATCH CORPORATION.

(District Court, E. D. New York. December 17, 1925.)

No. 1775.

**1. Patents ⬳328—Patent entitled to liberal interpretation, when one of primary importance.**

Paridon and Palmer patent, No. 1,042,472, for machine performing entire function of match book making, including painting, is one of primary importance, and is entitled to a liberal interpretation.

**2. Patents ⬳26(1)—Subcombinations, which are mere improvements adapting machine as whole to perform entire function, not primary inventions.**

Where functions of subcombinations of claims are old, and subcombinations are merely improvements, adapting machine as a whole to perform entire function of match making, such subcombinations are not primary inventions except when limited to match-making machine.

**3. Patents ⬳241—Infringement not necessarily established by complete identity of results.**

That there is a complete identity of result as between plaintiff's and defendant's machines does not necessarily establish infringement.

**4. Patents ⬳234—Noninterchangeability strong indication of noninfringement.**

That parts of defendant's machine and machine of patent in suit are not interchangeable is a strong indication of noninfringement.

**5. Patents ⬳328—1,042,472, for making match books, claims 18, 21, 22, and 26, held valid, and not infringed.**

Paridon and Palmer patent, No. 1,042,472, claims 18, 21, 22, and 26, for making match books in entirety, including painting, *held* valid, but not infringed by defendant's wrapping and stapling machine.

In Equity. Suit by the Diamond Match Company against the Sun Match Corporation to restrain alleged infringement by defendant of a patent issued to plaintiff as assignee. Decree entered, dismissing bill of complaint.

John R. Nolan, of New York City (William A. Redding, of New York City, of counsel), for plaintiff.

Arthur H. Serrell, of New York City (William Houston Kenyon, Edgar F. Baumgartner, Arthur H. Serrell, and Kenyon & Kenyon, all of New York City, of counsel), for defendant.

CAMPBELL, District Judge. This is a suit in equity, brought by the Diamond Match Company, plaintiff, to restrain the alleged infringement by the Sun Match Corporation, defendant, of United States patent No. 1,042,472, issued to the Diamond Match Company, the plaintiff, as assignee of Michael Paridon and Thomas A. Palmer, for machine for making match books, dated October 29, 1912, and for damages. Another patent to one Campus, No. 1,073,394, is mentioned in the bill of complaint, but withdrawn.

The defense urged upon the trial and in the briefs of defendant's counsel is that of noninfringement.

This action is based upon claims 18, 21, 22, and 26, which read as follows:

"18. In a machine for making match books, the combination, with a carrier, of means for inserting covers therein at one part of its traverse, means for inserting match cards having headed splints into said carrier at another part of its traverse, and placing them parallel to the covers and with the heads of the splints extending rearward, and means for fastening together the covers and match cards while in the carrier."

"21. In a machine for making match books, the combination, with a cover carrier, of means for supporting match strips laterally of the path of travel of said carrier, means for severing the margins of said strips to form match cards of predetermined length, and means for feeding such cards successively to the carrier and within the covers carried thereby.

"22. In a machine for making match books, the combination, with a cover carrier, of means for supporting match strips laterally of the path of travel of said carrier, a cutter whereby said strips are severed at their margins to form match cards of predetermined length, means for feeding the strips to the cutter, and means for feeding the severed cards successively to the covers carried by said carrier."

"26. In a machine for making match books, the combination, with a cover carrier, of means for supporting a match strip laterally of the path of travel of said carrier, a cutter adapted to sever the margin of a match strip transversely to produce match cards of predetermined length, means for actuating the cutter, means for moving the successively severed cards beyond the cutter and into the carrier and the covers therein, and means for moving the remainder of the strip endwise after the severance of each card therefrom to present another portion of the strip to the actions of the cutter and card-moving means."

Machines for the wrapping of a great variety of articles, and for conveying to and

stitching articles, and machines for making and packing matches, and patents covering those machines, are shown in the prior art, which was introduced by the defendant. These consisted of 16 United States patents.

The defendant's expert prepared and described a chart of some of the prior machines and the machine in suit, which was received in evidence as Defendant's Exhibit H. The chart is divided into six columns, which, reading from left to right, show in the first column the number of the patent and name of the patentee, in the second the kind of carrier, in the third the manner in which the wrapper is applied to the carrier, in the fourth the manner in which the article is applied to the wrapper, in the fifth the manner in which the wrapper is folded while on the carrier, and in the sixth the manner of fastening.

In the Schloss patent, No. 566,540, the carrier is of the chain type. On each link are a pair of upright posts, and a pocket is formed between the rear post on one link and the leading post on the next succeeding link. The wrapper is applied to the carrier from a stack by a device consisting of a rotary shaft with four radial arms; the article is applied to the wrapper by hand "or in any other desired manner." The folding is accomplished by the flat cover blank, on which the article to be folded is laid, being pushed down and folding up the two sides of the cover blank, which thus stands up on either side of the article to be wrapped. The apparatus then produces in succession two folds, and the cover is fastened by the paste which adheres to the outside of one flap of the cover, having been placed thereon by the roller on the rotary arm just before it removed the cover from the stack. Schloss had in mind the wrapping of a bunch of braid, but described in his specification that for wrapping other kinds of articles certain adjustments must be made.

In the Van Vleet patent, No. 567,014, the carrier is in the form of a belt on which the cover is laid out flat by the picker 32, which pushes out blank X from the bottom of a stack in magazine N on the belt A. The pusher 30 cuts off the article from the pile in the magazine 37, and delivers it to the cover X, the lateral sides of which have been pressed up, to give a boxlike form, before the articles are introduced into the box. The longer flap is then turned up, and in the next step turned down over the cigarettes. The short flap is then turned down, and the package is fastened by means of a surrounding outside box open at each end, into which the package enters, like the drawer of a table.

In the Stearns patent, No. 570,615, the carrier is in the form of a wheel. There are outstanding projections on the periphery of the wheel forming separate pockets, which correspond to the pockets or recesses in carriers of the chain type. The wrapper placer Jj pulls the wrapper g off a stack over the pocket e in the carrier wheel E. The packages are brought up one by one by the package feeder K, which reciprocates horizontally, and when they are under the package placer L, which reciprocates vertically, it descends and takes the package between the pair of spring jaws and presses it down into the pocket of the carrier wheel. That action serves to fold up the two sides of the cover, the folding being completed by the five following folding operations, and the package is fastened by a paste.

In the Schloss patent, No. 574,174, the carrier is of the chain type, quite similar to the carrier in the prior patent, No. 566,540, of which this patent is in the nature of a development. The cover blanks are held in a stack or hopper, the stack being laid down horizontally, so that the edges of the wrapper blanks lie upon the bottom of the stack, which is formed by a belt which moves slowly toward the right, and the blanks are picked out one by one by a rotating picker of the suction type, which rotates with the wrapper and sets it down upon one of the pockets in the chain, and it rides to the point where the parcel is inserted. Above that is the article supported from the wrapper by an opening in the table, and above the article is a pusher, which pushes this article down through an opening in the table into the pocket, serving at the same time to bind up the sides of the wrapper around the article as it enters the pocket. These articles are brought to the machine one by one by means of a belt. The cover is then folded in the same manner as in the prior patent and fastened by paste, which is put on the wrapper at about the time it is laid upon the carrier.

In the Bunol patent, No. 579,038, the carrier is of the chain type, with box links open on the sides, with spring grips for the cover. The cover, prefolded by the same machine into the form of a six-sided open-ended box, is pushed into the carrier link. Cigars, cigarettes, or other articles are forced out into a plate 92, and are pushed from right to left by a pusher 92a against a stop on the left-

hand side. Then the pusher *94*, which moves at right angles to the pusher *92a*, forces out the desired number of cigars, cigarettes, or other articles into the cover *A*, through a guide marked *98*. After the articles are placed in the boxlike covers, its ends are folded over by a series of folders, as indicated in Figs. 22, 23, 24, and 25, and are fastened by being gummed while the ends of the cover are tucked in.

In the Armstrong patent, No. 691,737, the carrier is of the wheel type; the periphery of the wheel being provided with a series of pockets *36*, over which the cover is drawn from a reel. After a proper length of cover strip is drawn over a pocket, it is automatically cut off leaving a proper length in position. In this instance the material is caramel, and is fed toward the point of application by means of feed wheels, which feed the length of stock up against a stop. A descending knife then cuts off the desired portion of the stock strip to form the individual article to be wrapped. A pusher then descends, forcing the article with the cover underneath into the pocket, and in so doing folds up the two ends of the cover. The folding then takes place; there being no other fastening shown, as the folding is sufficient to hold the cover in place.

In the Landfear patent, No. 692,789, the carrier is also of the wheel type, with four pockets *87* around its periphery. The covers are in a pile of stock *W*, above which is a reciprocating pusher *54*, with a roughened lower surface which, as it moves to the left, operates the top wrapper of the pile to feed rolls *41* and *42*, which carry the wrapper over into position above the pocket of the carrier wheel. The articles (cigarettes) are fed in a long row by means of a belt *30* to a stop, and then a pusher *82*, called a placer, comes down and cuts off the desired number of cigarettes, and forces them, with the cover underneath, into the pocket, folding up the ends. The folding is completed by the making of a number of folds and fastened with paste.

In the Marresford patent, No. 707,787, the carrier is stationary in the form of a base plate, on one end of which are two parallel supported plates forming two superposed pockets, one above the other. The covers are contained in a stack in a hopper, which can be lowered, and the lower cover comes into contact with a belt, as the belt moves, when by friction the cover is drawn out from the stack, and is then passed through into the lower one of the two pockets on the carrier. The covers are fed from right to left. The articles, which are folded patterns, are folded from left to right from a hopper by a similar belt arrangement, which draws out the lower article from the hopper, which is then fed by rollers into the other pocket of the carrier. The two are then pushed together to the left of the carrier and are stapled by an ordinary stapling machine.

In the Hicks patent, No. 719,410, the carrier is of the wheel type, with pockets in its periphery, having spring-pressed plates on one side, which give a sort of spring grip to the article when in the pocket. The wrapper is fed from a continuous roll, a reciprocating knife cutting off a proper length, the wrapper being left on top of the pocket. The article (caramels), delivered individually, is pushed along the table until the leading article is over the pocket in the carrier wheel, and then a pusher descends and presses the article, together with the cover, into the pocket, turning up the sides. The succeeding folding operations are shown, and they are sufficient, without any other fastening.

In the Page and Hopkins patent, No. 765,320, the carrier is of the wheel type with pockets *E'*, having a removable bottom formed by a spring-pressed plunger; this movable bottom being in its outward position at the time the wrapper is applied to it. The wrapper is fed upwards in front of the pocket, the proper length being automatically cut off as it reaches its position in front of the pocket. The strip of stock is fed into the holder for the cutter by means of reciprocating jaws $B^9$ and $B^{10}$, which automatically open up as they recede and then come together and grip the strip, then move forward holding the strip in their grip, and when they reach the desired point the jaws open and the action is repeated. The cut-off article is fed horizontally to a position directly opposite the pocket and outside of the wrapper, then a vertically moving pusher moves the article with the wrapper into the pocket, pressing the movable bottom and moving it down into the bottom of the pocket. The succession of folding operations are shown and they are sufficient without any other fastenings.

In the Grisel patent, No. 419,851, a machine for wrapping match cards is shown. The carrier is of the wheel type; the card therein, called a block, being put in a holder on the carrier wheel. The wrapper is drawn from a reel, the length of it is automatically cut off, the holder of the carrier in which the block is contained has a hinged side, which is turned back so that the

end of the wrapper can be introduced between the inside of the holder and the card itself, and the wrapper is then secured at one end between the match blank and the outside wall of the carrier. Then the holder is whirled around to wrap the cover around both the block and the article. The strip of cover is suitably wider than the length of the block, and the protruding end is twisted into a sort of knot by two folders on either side with wavy edges. It is then rolled down by passing under a roller to finish the wrapping.

In the Parker patent, No. 704,091, machine for cutting and packing matches, there is shown a strip of match material, wood or it may be of paper, which has been dipped, marked *10*, fed between rolls *25* to a cutter knife *36*, which cuts off the individual splints, and they fall upon a traveling belt and are carried by that belt to a chute *51*, which delivers them to an open box *52*, on a traveler carrier belt *53*. The belt which carries the filled boxes moves in a direction at right angles to the belt which delivers the splints from the cutter to the box on the carrier.

In the Bell patent, No. 447,931, there is shown a machine for cutting and packing matches. A series of sheets of match material marked $C^5$ are fed downward by rolls *d* through slots in the surrounding frame of the machine, until their lower end rests in grooves *e* of a depth corresponding to the thickness of the splint which is to be cut from the strip; said grooves being in block *e'* The knives *ff* advance together and cut off from each of the sheets a splint, which is the part which remains in the groove *e* in the block *e'*. There is a pusher for each of the grooves, marked *g*, which pushers are connected by a block $d^2$. The splints are pushed by the pushers into a series of holders or grippers *h*, in the rim of the wheel *i*. The wheel rotates step by step, carrying the splints thereon, first through a feeder box *i*, thence to a paraffin tank, and then in succession passes the matches to a composition tank, and finally they come to an ejector *q*, which pushes the individual matches out from the gripper *h*, and delivers them to the box $r^6$, which is carried on a traveling conveyor comprising an upright belt *r*, with wings thereon $r^5$, and push the box along the shelf $r^7$.

In the Palmer and Denmead patent, No. 636,170, a match card or strip is shown, composed of a series of matches united to a common part, which may be formed into a book. Stock is continuously drawn from a roll of strawboard or other paper, fed to splint-forming devices, and thence placed in an endless chain, which, after the splints are formed, takes them to the paraffining and composition-applying device.

In the Eisenhart patent, No. 643,047, is shown a continuous match-making and boxing machine. Match splints are cut from prepared cylinders of wood, inserted end first in the perforations of carrier bars on an endless carrier, and held therein. The splints are then carried by the endless carrier over a heater to open the pores of the wood, and then over a tank containing melted paraffin, into which the splints are dipped. The splints are then conveyed over a roller revolving in a tank containing the ignition composition, which is applied to the free ends of the splints to form the heads. The carrier then takes the splints through a cooling room in which the ignition composition is set, and from there to the ejecting and boxing mechanism, when they are ejected and boxed, and the boxes closed and discharged from the machine.

In the Hart patent, No. 538,039, a series of articles are brought by an intermittently moved carrier, a feed chain or belt, to a stitching mechanism, which acts upon each one in succession.

Before Paridon and Palmer, match books were made by a hand process, in which single match cards were booked by putting the two cards into a cover, folding the covers by hand, placing them in a slotted stick, so they could be passed through a stitching or stapling device, and a friction painting operation and drying, and they were later boxed up.

From an examination of the prior art it appears that wrapping machines are very old, and that they employ a number of standard expedients, which, while present, are not identical in different machines. The carrier of the chain type or the wheel type, which always moves step by step and is held stationary at the time the different operations are being performed; the wrapper, which is frequently cut from stock at the time it is applied to the carrier; the feeding of the wrapper to the carrier; the applying or laying of the wrapper upon the carrier; the feeding of the article and laying it upon the wrapper; the folding of the cover around the article, in most cases fastening it in one way or another, and ejecting it from the machine.

In all the machines the dimensions of the pocket or other place of reception, and the pushers and other parts that need not be

enumerated, are, and must of necessity be, adapted to the size of the article which is being wrapped, in some cases being adjustable to a slight extent, so that they may take in different sizes. We also find that it is old to fasten covers by machine with a staple, and that it is likewise old to produce match sticks and to wrap them by machinery with covers.

Prior to the invention of the patent in suit much of the work of making match books was done by hand. Single match cards or strips were produced, the margins of which had been scored in blank by a power-driven machine, and the cards were broken off by the booker, and booked by putting the two cards into a cover, which was folded by hand and placed in a slotted stick, so that they could be passed through a stitching or stapling device, a friction painting operation, and drying, and they were later boxed up.

After the book elements were assembled in the stick, they were carried to a stitching device. After the stitching had been accomplished, they were passed over a painting apparatus, that put the friction paint or ignition composition on the stapled margin. They were then placed on trays or boards to dry. A skillful person was able to fill about 24 to 30 sticks of 18-book elements each per hour, and in a day of 10 hours 4,320 to 5,400; but much extra labor was required.

In the hand operations of making match books, it would have required about 38 to 40 operators to produce approximately 15,-000 books per hour, exclusive of the composition applying and drying, while the output of one of the Paridon and Palmer machines, with two boy attendants, is 150,000 match books in a 10-hour day, including the composition applying and drying. Prior to the Paridon and Palmer invention, no machine for the complete manufacture of match books had appeared, but prior to that time match books had been made partly by hand and partly by machine.

It therefore seems to me that the problem which confronted Paridon and Palmer, and which they successfully solved, was not the invention of the subcombinations of the claims of the patent in suit, upon which this action is based, but was the accomplishing in one automatic machine of every operation to make a complete match book, including the painting with ignition paint, and this furnishes a useful guide in understanding the patent in suit, and a controlling guide in construing its claims. Steinau Co. v. Common Sense Novelty Co. (C. C. A.) 3 F.(2d) 144; Godwin Co. v. International Steel Tie Co.

(C. C. A.) 2 F.(2d) 198; Continental Paper Bag Co. v. Eastern Paper Bag Co., 210 U. S. 405, 28 S. Ct. 748, 52 L. Ed. 1122.

[1] The patent in suit, in the performance of the entire function of match book making, including painting, in one machine, is one of primary importance, and entitled to a liberal interpretation. Eibel Co. v. Paper Co., 261 U. S. 45–71, 43 S. Ct. 322, 67 L. Ed. 523.

[2] The inventions of the claims in issue, however, if the same are not limited by the words "in a machine for making match books," are not primary inventions, for the functions of the subcombinations of those claims were old, and those subcombinations were merely improvements adapting the machine as a whole to perform the entire function of completely making a match book in one machine. Westinghouse v. Boyden Power Brake Co., 170 U. S. 537, 18 S. Ct. 707, 42 L. Ed. 1136.

It does not seem to me that Menzer v. Kenworthy (D. C.) 275 F. 649, cited by plaintiff, is in point, because the contention of the defendant is, not that the subcombinations claimed in claims 18, 21, 22, and 26 will not do useful work separately, but that, if such claims are not limited by the words "in a machine for making match books," they show no invention over the prior art.

In the machine of the patent in suit, as it is generally described in the patent, "the cover blanks are successively fed from a source of supply, folded at one end, and introduced to an endless carrier, by means of which they are advanced to position to receive the match cards. Strips of previously prepared stock, of a length comprising several match cards, are fed into the machine, and cards of proper length are severed from the strips. These cards are accurately positioned and pushed into the opposing folded ends of covers in the carrier. The carrier transports the cards and covers thus assembled to mechanism whereby they are fastened together; thence to devices whereby frictional igniting substance is applied exteriorly to the folds of the covers; thence through an extended drying path and back near to the cover magazine. At this point the cards, with their attached covers, are transferred from the carrier to devices whereby the outwardly extending portions of the covers are turned over on the outer sides of the match cards, and the free ends of the flaps thus formed are tucked in under the edges of the folds."

The machine of the patent in suit is a double one; the defendant's machine is a single one. In the defendant's machine the

covers which have been painted by another machine are successively applied by a suction device, from a source of supply, to an endless carrier; the cover, still being in its blank form, lying across the carrier on the flat part of the link. Strips of previously prepared stock, of a length comprising several match cards, are fed into the machine, and cards of the proper length are severed from the strip, and are pushed over on top of the flat blank. The short flap at the rear of the machine is then turned, the carrier advances, and the long flap is folded over the cards, and the short flap, which has been maintained in a vertical position, is folded down with the end of the long flap underneath it. The carrier then advances the assembled and folded parts to a stapling machine, where it is stapled and the completed article ejected.

The machine of the patent in suit is for the making of a complete match book, including the painting with ignition paint, while the defendant's machine, although performing a part in the making of a match book, is simply a wrapping machine; and while, of course, there is some similarity between the two machines, the defendant's machine does not embody any of the novel and important features that are incorporated in the machine of the patent in suit for the solving of the problem which confronted the patentees.

[3] Even if there was complete identity of result (which there is not), it would not necessarily establish infringement. Westinghouse v. Boyden Power Brake Co., supra; Hartford-Fairmont Co. v. United States Glass Co. (D. C.) 2 F.(2d) 109; Burr v. Duryee, 1 Wall. 531, 17 L. Ed. 650; Kokomo Fence Machine Co. v. Kitselman, 189 U. S. 8, 23 S. Ct. 521, 47 L. Ed. 689; American Crayon Co. v. Sexton, 139 F. 564, 71 C. C. A. 548.

A comparison of the machine of the defendant with the machine of the patent in suit shows that in the defendant's machine the operation and mechanism of wrapping machines of the prior art are closely followed, while in the machine of the patent in suit, the object of the patentees being to make a complete match book, they were confronted with the requirement that the friction paint be applied from underneath and after stapling, and it was to meet these requirements that they embodied in their machine the novel and important features described in the patent in suit.

The defendant's machine differs from that of the patent in suit, not merely in form,

but in function and manner of operation, and the result obtained on the machine is not the same. In defendant's machine, the links of the carrier are flat members, with upstanding posts at their corners, the wrapper blanks are laid flat on the links, the article pushed onto the blank, and the ends of the blank folded up over the article.

In the Paridon and Palmer machine, the links of the carrier are boxlike in form, and within each link is arranged a flat spring, which inclines from the forward end of the bottom and presses against the upper flanges or top, requiring the forcible insertion of the cover; and this novel construction is adopted, so that the cover may be inserted upside down, and the match cards thereafter inserted underneath and within or into the cover, and thus allow for the painting of the lower flap after it is stapled, and so that the cover and match cards may be properly held during the stapling, painting, and drying operations.

In defendant's machine, the blanks which have previously been painted are taken from a stack by fingers having suction cavities in their ends, that swing up into contact with the lower blank of a stack, and then swing down and leave the blank on the link.

In the Paridon and Palmer machine, dominated as it is by the presence of the painting operation, it was found necessary to fold the short flap before the cover is inserted in their carrier, and to bend back the end of that flap for the purpose of later tucking in the long flap. This is accomplished by separating a cover blank from a stack by a pneumatic device, and moving it over the top of a support that has a curved slot and a horizontal slot, and by a curved blade striking the cover blank, forcing it down the curved slot, folding over the short flap of the match book cover, bending back the end of that fold, and by a further stroke of the blade forcibly inserting the now folded cover into the link and underneath the spring.

In the defendant's machine, the match cards after being severed from the stock are fed on top of the flat blank.

In the Paridon and Palmer machine, the cover is held against the top of the link by the flat spring, and the match cards are forced in between the spring and the underside of the cover, into and within the prefolded short flap of the cover, which is held sufficiently open for that purpose. To prevent the forcing of the cover out of the carrier during the feeding of the match cards, a yielding bumper is provided, which is an essential part of the feeding apparatus.

In the defendant's machine, the folding is done by fingers, supplemented by a metal edge mounted on the frame under which the short end of the blank is carried, and an inclined plane along which the short flap glides; the long flap being folded over and down on the top of the matches, and the short flap being folded over and down upon the match cards, its end overlapping and holding down the end of the long flap.

In the Paridon and Palmer machine, no folding operations are performed while the covers with the match cards inserted are in the carrier.

In defendant's machine, after the folding of the flaps is completed, the carrier moves the assembled and folded parts to the stapling machine, where the book is stapled and is ejected from the machine as a completed book.

In the Paridon and Palmer machine, stapling does not complete the book, but the machine next paints a band of friction material on the folded short flap, which is followed by a drying operation, and the partly made match book, with the large flap still unfolded, is ejected from the carrier into a folding wheel, where the long flap is partly folded. The partly made book is ejected from the wheel, and the folding of the long flap is completed, and by another device the end of the long flap is tucked under the short flap, and the book is completed.

The folding of the long flap cannot be accomplished on the carrier of the Paridon and Palmer machine, due to the peculiar construction of the carrier and the holding of the parts upside down by the spring 80.

The defendant, in its machine, has followed the prior art, which was open to both the plaintiff and defendant; but Paridon and Palmer were unable to make use of the ordinary and well-known appliances of the art, without making changes and modifications which were not obvious, but wholly unknown, in order to accomplish the purpose they had in mind, the making of a match book in one machine, including the painting after stapling, and I cannot find embodied in the defendant's machine the equivalent for any mechanism or feature included in the machine of the patent in suit for the purpose of solving that problem.

The elements of claim 18 are: "In a machine for making match books, the combination, with a carrier, of means for inserting covers therein at one part of its traverse; means for inserting match cards having headed splints into said carrier at another part of its traverse, and placing them parallel to the covers and with the heads of the splints extending rearward; and means for fastening together the covers and match cards while in the carrier."

The carrier of this claim must be one that possesses the characteristics required in order that the carrier will operate in "a machine for making match books"; that is, one in which the cover is held in an inverted position against the top of the carrier by yielding holding means, in order to make a place for the match card below the cover, and to make possible the subsequent painting of the ignition paint on the short flap. The claim also specifies "means for inserting covers therein" and "means for inserting match cards."

In both instances, the word used is "inserting," which, as used in the specifications of the patent in suit, in describing the preferred embodiment of the patentees, is used to describe a thrusting of the cover into the carrier, and the match card into the cover in the carrier, in opposition to the flat spring. The word "inserting" generally implies something surrounding or inclosing the object inserted, after the act is completed.

The qualification of the means for inserting match cards, by the words "with the heads of the splints extending rearward," does not distinguish said claim from the prior art, because it was obvious and a matter of manual adjustment by the attendant to so feed said match cards.

The claim also specifies that the covers and match cards are to be fastened together "while in the carrier." By this the construction claimed is limited to one so formed that the covers and match cards are in, not on, the carrier, because there was nothing new in fastening the covers with staples or paste while on the carrier.

Defendant's carrier is not the carrier of this claim. It is merely a flat link, having lugs that compel the wrapper blank and match card to move with the carrier covers, and they cannot be inserted therein, but can only be placed thereon, as it does not grip the cover, nor can the cover be held in an inverted position, so that a match card can be inserted beneath the cover, nor does it inclose the cover blank or the match cards placed thereon. The means for feeding the cover blanks flat in the defendant's machine would be useless as a means for inserting the covers in the Paridon and Palmer machine, as they could only place the covers on the outside of the top flanges of the link.

If claim 18 of the patent in suit could be construed as covering the defendant's ma-

chine, then in my opinion it would lack novelty and invention over the prior art, especially Schloss patents, No. 566,540 and No. 574,174, Stearns, No. 570,615, Landfear, No. 692,789, Van Vleet, No. 567,014, Marresford, No. 707,-787, and Hart, No. 538,039; but I am unable to read that claim on the defendant's machine. The elements of claims 21 and 26 are:

"21. In a machine for making match books, the combination, with a cover carrier, of means for supporting match strips laterally of the path of travel of said carrier, means for severing the margins of said strips to form match cards of predetermined length, and means for feeding such cards successively to the carrier and within the covers carried thereby."

"26. In a machine for making match books, the combination, with a cover carrier, of means for supporting a match strip laterally of the path of travel of said carrier, a cutter adapted to sever the margin of a match strip transversely to produce match cards of predetermined length, means for actuating the cutter, means for moving the successively severed cards beyond the cutter and into the carrier and the covers therein, and means for moving the remainder of the strip endwise after the severance of each card therefrom to present another portion of the strip to the actions of the cutter and card moving means."

Both of these claims are limited to combinations "in a machine for making match books," and differ only in that in claim 26 is included "means for moving the remainder of the strip endwise. * * *" The cover carrier of these claims must be of the construction described in the specifications of the patent in suit, or a similar construction, and not the carrier of the defendant's machine because the combination of claim 21 includes "means for feeding such cards * * * within covers, * * *" and the combination of claim 26 includes "means for moving * * * cards * * * into the carrier and the covers therein," and nothing can be fed "within covers" or into the carrier on the defendant's machine.

There is no boxlike link on the defendant's machine into which the covers can be fed, nor are there covers within which anything can be fed, because in the defendant's machine the cover blanks are laid flat on the carrier, and the match cards are placed on the flat cover blank before any folding is done.

There is no equivalent in defendant's machine for the pusher 131, or the resilient bumper 151, 152, of the machine of the patent in suit, constituting the means for placing the cover blanks on the carrier and the match cards on the covers, on the machine of the patent in suit, because there is no pusher on the defendant's machine capable of overcoming the obstruction of the spring 80 in inserting the covers with the short flap folded, nor in inserting the match cards into the said cover, and no resilient bumper to prevent the covers from being forced out of the links of the carrier.

There was nothing new in cutting a piece from the end of the strip of stock which was supported laterally of the path of the carrier, nor in the means for feeding the severed portions successively into the carrier, nor in the means for removing the remainder of the strip of stock endwise.

If these claims are not limited to a machine that as a whole will perform all the operations necessary to produce a match book, including the application of ignition paint, and construed with reference to the necessities of such a machine, but can be read on the defendant's machine, then I can see in such claims no novelty or invention over the prior art, especially the patents to Schloss, No. 574,174, Armstrong, No. 691,-737, Page and Hopkins, No. 765,320, Van Vleet, No. 567,014, Bunol, No. 579,038, Landfear, No. 692,789, Parker, No. 704,091, and Bell, No. 447,931; but I cannot read said claims on the defendant's machine.

The elements of claim 22 are: "In a machine for making match books, the combination with a cover carrier of means for supporting match strips laterally of the path of travel of said carrier, a cutter whereby said strips are severed at their margins to form match cards of predetermined length, means for feeding the strips to the cutter, and means for feeding the severed cards successively to the covers carried by said carrier." The same limitation is found in this claim as in the others, and, as I construe it, the combination produced by the enumerated elements is a combination "in a machine for making match books.".

While this claim does not contain the express limitation that the covers are to be inserted "into" the carrier, or that the match cards are to be fed or moved within or into the covers, still the carrier of the defendant's machine could not hold the covers in such a manner that they could be painted by any known painting device, after the short

flap had been folded and stapled, and therefore the carrier of the defendant's machine could not substitute for the carrier of the machine of the patent in suit.

If claim 22 can be read on the defendant's machine, I cannot see that it has any novelty or invention over the prior art, especially the patents to Page and Hopkins, No. 765,320, Armstrong, No. 691,737, Van Vleet, No. 567,014, Stearns, No. 570,615, Schloss, No. 574,174, Bunol, No. 579,038, Landfear, No. 692,789, Hicks, No. 719,410, Parker, No. 704,091, and Bell, No. 447,931; but I am unable to read said claim on the defendant's machine.

[4] The machine of the patent in suit is "a machine for making match books," and each of the combinations specified in claims 18, 21, 22, and 26 is a combination in such a machine. The parts of defendant's machine and the machine of the patent in suit are not interchangeable, and this is a strong indication of noninfringement. Miller v. Eagle Manufacturing Co., 151 U. S. 186, 208, 14 S. Ct. 310, 38 L. Ed. 121; American Graphophone Co. v. Gimbel Bros. (D. C.) 234 F. 344.

[5] I am unable to follow the plaintiff's contention that the combination described in the claims of the patent in suit, on which this suit is based, are embodied in the defendant's machine, and that defendant's machine has appropriated every element of the patented combination, the differences being of form and not of substance, because the machine of the patent in suit is a machine for making match books in their entirety, including painting, and having many novel improvements, which make it effective for the accomplishment of that purpose; while the defendant's machine is a wrapping and stapling machine, and closely follows the prior art, and, as it has been hereinbefore pointed out, if each mechanism thereof be individually considered in the comparison of function, operation, and result with the machine of the patent in suit, they will be found not to be equivalents. Rowell v. Lindsay, 113 U. S. 97, 5 S. Ct. 507, 28 L. Ed. 906; National Automatic W. M. Co. v. New York Scale Co. (C. C.) 145 F. 951, American Roll Gold Leaf Co. v. V. W. H. Coe Mfg. Co., 212 F. 721, 725, 129 C. C. A. 330; American Automatic Ry. Switch Co. v. Shepherd A. S. Co., 193 F. 406, 409, 113 C. C. A. 340; General Electric Co. v. Allis-Chalmers Co., 178 F. 273, 274, 101 C. C. A. 537.

The patent in suit, as I have construed the claims on which the suit is based, is valid, but the machine of the defendant does not infringe. A decree may be entered in favor of the defendant against the plaintiff, dismissing the bill of complaint herein, with costs.