## CONNECTICUT GENERAL LIFE INS. CO. v. MAHER.

### No. 6937.

Circuit Court of Appeals, Ninth Circuit.
April 13, 1934.

F. Eldred Boland, Daniel V. Ryan, and Knight, Boland & Riordan, all of San Francisco, Cal., for appellant.

J. E. Trabucco and Vincent Surr, both of San Francisco, Cal., for appellee.

Before WILBUR and SAWTELLE, Circuit Judges, and NORCROSS, District Judge.

NORCROSS, District Judge.

From a judgment rendered upon verdict of jury in favor of appellee as beneficiary of a policy of accident insurance issued by appellant, defendant below, the latter appeals. The policy was issued on March 3, 1930, to Helen M. Rohrer, the insured, who was a sister of appellee. By the terms of the policy appellant agreed to pay the beneficiary therein named the principal sum of $7,500 in the event of the death of the insured "resulting directly, and independently of all other causes, from bodily injuries effected solely through accidental means." The policy further provided: "This insurance does not cover loss resulting from suicide, or any attempt thereat, sane or insane ＊ ＊ ＊ or by disease or bodily or mental infirmity. ＊ ＊ ＊" On August 17, 1930, the insured was killed as a result of falling to the pavement below from a window of an apartment on the sixth floor of an apartment house located on Pacific avenue, San Francisco, in which she was then residing. At the time of her death the insured was the wife of J. H. Hoge to whom she was married June 20, 1930. Appellant by its answer denied that the insured came to her death by accidental means. Upon the

conclusion of the evidence defendant moved for a directed verdict upon the ground "that the evidence was not sufficient, and in particular that there was no evidence to show that the decedent Mrs. Hoge came to her death by accidental means, but, on the contrary, there is affirmative evidence sufficient to justify a directed verdict that she actually committed suicide." Appellant's specifications of error relied upon on this appeal are as follows:

(1) The verdict of the jury finding that Helen Hoge met her death by accidental means, as required by the policy, is unsupported by the evidence.

(2) The verdict of the jury finding that Helen Hoge did not commit suicide, while sane or insane, is unsupported by the evidence.

The testimony and documentary evidence submitted upon the trial establishes the following facts: On Sunday night, August 17, 1930, a special police officer found the body of the insured on the pavement of the apartment house court. Her skull was crushed as a result of a fall. She was fully dressed except coat and hat. In one of her hands was a lady's handkerchief which was tied in knots. The officer observed an open window above on the sixth floor, which proved to be in the apartment occupied by the decedent and her husband. The window sill was 2 feet from the floor, 35 inches wide, and measured 7 inches across from inside to outside. The lower window sash opened about 21¼ inches. There was found beside the open window a chair. The insured was thirty-two years of age at the time of her death. She was about 5½ feet in height and weighed about 130 pounds. She was married in October, 1923, to a Mr. Rohrer from whom she obtained a final decree of divorce five years later. She had been a schoolteacher since the age of eighteen, and continued in such profession until her second marriage.

William Curtis, the police officer who found the body of the insured, testified concerning the location of the window of the apartment and the view therefrom, as follows:

"I recall that the fleet came into the harbor the day before. From the bedroom you could look right through that window and see the fleet coming in. And the further you leaned out the further you could see, because there is one wing of that house to the right and one wing to the left. There is a courtyard and outside of the courtyard there was a wall of brick or concrete intersecting a little space. It was the lightwell of the basement. * * * "

A number of witnesses called by the plaintiff testified concerning the normal character and disposition of the decedent as they had known her for many years prior to a time within a few weeks or months of her death, and prior to a time testified to by Dr. Reissel G. Ryan, a witness for defendant. The testimony of these several witnesses for plaintiff negatives any view of mental disorder or suicidal mania during any of the time covered by their testimony.

Plaintiff, appellee, testified that a few days following the death of the insured he called upon Mr. Hoge and requested the insurance policy; that he asked Mr. Hoge if she had left any papers there or anything and he said, "No"; that Mr. Hoge said "there were no suicide letters or notes or anything."

Dr. Ryan, a witness for defendant, testified that he was a surgeon, duly licensed to practice; that he was a friend of the decedent's husband, and with his mother called upon Mr. and Mrs. Hoge shortly after their marriage. He testified he observed the demeanor of Mrs. Hoge at that time; that "it was rather reserved, but within the normal range." Some "two or three weeks later," the witness testified decedent called at his office, "very nervous and very much upset. * * * She had to get up and walk up and down my office and telling my nurse and myself 'This is terrible.' * * * I couldn't do anything with her. I gave her some nerve medicine and she went home. Two or three other, or probably four times, she came to my office, and acted in about the same manner. * * * Mrs. Hoge mentioned her intention to commit suicide many times, practically every time I saw her. She always contended it was necessary. She insisted that her domestic relations were perfectly happy, but said this was awful and there must be an end to it. I never did find what the trouble was; but I believe there was some mental condition. That was both professionally and personally. I am a surgeon and not a mental specialist, but there was something abnormal at least temporary." The witness further testified that he sent the patient to the St. Francis Hospital for examination or "diagnostic curetage"; that he "curetted her, and sent a specimen to the laboratory, and Dr. Moody, the pathologist, returned a report of chronic endometritis." This was described by the witness as "not a serious condition. It simply means we are dealing with a condition of the uterus, and not an acute infection."

On the forenoon of the day preceding the death of Mrs. Hoge the witness made a professional call at her apartment. Concerning this call he testified:

"I offered her some medicine. She said 'No, when I get out of the influence, things will be just the same as before.' She intimated she was going to do away with herself. * * * I gave her some luminal, which we sometimes give to nervous and excitable patients, and then I started to leave and she said: 'Well, I will end it all. I am going to finish this business; going to kill myself.' So I went back and had another talk with her; tried to reason with her, and the luminal began to work then, and she became quiet, and I went back to my office."

The witness testified upon his return to his office he sent for her husband, and that the testimony of the witness given at the inquest respecting that meeting was correct as follows:

"I told him of her threat, and of her condition, and talked the case over; and I told him that it was my opinion that women who made those threats make them so frequently that the ones who usually make them do not carry them out, and as she was so solicitous regarding her condition and coming with trivial complaints, I thought she really wanted to live, and that it was a nervous outburst, but we wanted to observe her."

"Mr. Hoge told me that on many nights he had been kept up all night by the same behaviour; and as a means of treating her and observing her further I suggested that he go out of town and go to his country place over the week end, and get a rest for himself, and leave the patient alone and let her work it out, and I would drop in and see her again.

"To amplify that Mr. Hoge when he went with me, told me that for two or three weeks probably Mrs. Hoge would wake up and turn on the radio, and turn on all the lights, and carry on just about the same as she had in my office, saying she was very unhappy, and 'This is terrible', and she could not get any sleep. * * * 'she is just that nervous and I know she would not commit suicide.'"

Concerning the statement of Mr. Hoge last mentioned, the witness testified that he said to Mr. Hoge:

"Well, I don't believe there is any mental aberration there, 'and probably it would be better to separate them and let him go away for a few days.'"

The witness further testified:

"On the occasion of my visit on that Saturday I neither concluded that she was likely to commit suicide nor that she was not likely to commit suicide. I did not know either way. The woman was upset. I quieted her. I wanted to send her back to her husband but they both worked on each other. He told me that it was better to separate for a day or two and calm her down. I felt that was the better thing to do, and I then suggested 'All right, that is a good idea.' 'You go to your country home and leave Mrs. Hoge alone, and we will see what happens.' It was my intention to go back Sunday."

Dr. Ryan responded to a professional call out of the city early the following morning. Upon his return he was advised of the death of Mrs. Hoge.

Relative to the amount of luminal administered to his patient on the occasion of his visit the day preceding her death the witness testified: "I gave her either three grains or four and a half grains. I do not recall if I left more than I instructed her to take. I do not believe that I did." The attention of the witness was directed to an excerpt from the Dispensary of the United States, 1927, page 828, as follows:

"Large doses have a marked depressant action on the circulation * * * There have been a considerable number of cases of more or less serious toxic action, at least one of which ended fatally: (Phillips (Journal), American Medical Association, 1922, LXXVIII, p. 1199), has collected reference to sixteen cases of poisoning. This is usually characterized by a fever, and a dermatitis * * * Amaurosis, mental confusion, ataxia and aphasia have been reported in isolated cases. In a number of instances quantities of 4½ grains in 24 hours have produced active poisoning. Phillips concludes that a single dose should never exceed 0.1 gram (1½ grain) nor 0.2 gram (3 grains.)"

Commenting upon the foregoing excerpts the witness testified:

"I think that is the difference between theory and practical medicine. I have used luminal many years, and many of these things theoretically are not borne out practically. I would say it is wrong."

Concerning the effect of luminal the witness also testified:

"I know Dr. Chauncey Leake very intimately. * * * I do not know of any better pharmacologist. I believe he is right that

luminal has the effect of interrupting the brain impulses. He was also correct in saying that an impulse to the muscle would seem to be interrupted on the way, and the muscle does not get the proper command. I think within a reasonable time it would be true that a person walking around would think that his muscles would do one thing and they would do another."

The husband of decedent was not called as a witness. His son, who also resided at the apartment, testified:

"I saw her the day she died * * *. I was leaving the house at noon. * * * I knocked on the door and went in. She was in bed, and she looked like she was groaning, and she was rolling all around, and I asked her if she needed a doctor, and she said 'No, it was something that did not concern me.' She wanted to be alone, so I left. She appeared to be nervous. I returned between 7:30 and 8 o'clock p. m. * * * The first I knew was when the officers came to the door and spoke to me. * * * I noticed the finger marks that Officer Cooper testified to. I noticed them on the inside; I noticed it here (indicating the right end of the window sill). I did not notice any foot marks."

James J. Cooper, an inspector of police, called to the scene upon finding the body of Mrs. Hoge, testified as a witness for defendant as follows:

" * * * We found the room to be in perfect order except a chair which was placed near the window and which looked like some one had either sat upon it or stood upon it. * * * We found foot prints and finger prints on the window sill of this open window * * *. I do not exactly recall just what the finger prints were but it seems to me that they were of a sort of sliding nature, as if some one hung on the outside of the window. There was just one foot print on the window sill. I do not recall whether it was the heel or the sole of the foot, on the ledge. * * * The marks of the finger prints were, as nearly as I can recall, of an even line, they were the same at the beginning as at the end. The palm did not follow and obliterate the fingers. They were finger prints on the window ledge not the palm of the hand. The window sill means a narrow ledge, seven inches, at the foot of the window. The finger prints were on the outside of the ledge, not on the inside of the window sill. The foot print also was on the outside."

The coroner's certificate of death, as appears from the records of the California state board of health, contains the statement:

"The cause of death was as follows: crushing of the skull. Suicide—by jumping from window while mentally deranged."

Appellee having alleged death by "accidental means" it was incumbent upon him to prove this contention by a preponderance of the evidence. U. S. Fidelity & Guaranty Co. v. Blum (C. C. A.) 270 F. 946, 953. The fact that insured died because of the fall is undisputed. Assuming that there was evidence sufficient to support a conclusion of the jury that the insured did not intend to commit suicide but that her death was occasioned by leaning out the window too far for the purpose of better viewing the fleet and in so doing was overcome by the law of gravity and fell to the pavement below, will such a state of facts establish death by accidental means as distinguished from accidental death? This question has been answered in the affirmative by the decision of this court in U. S. Fidelity & Guaranty Co. v. Blum, supra. From that opinion we quote:

"Counsel for plaintiff in error suggests a hypothesis which supposes that the deceased, not having been affected with dizziness, had voluntarily placed himself head foremost at the outer ledge of the window, and so near the outer edge as to be within the danger zone and beyond the point where the laws of gravity and friction would tend to hold him; that is, in a position where the laws of gravity would tend to pull him over the ledge to the sidewalk beneath. If such were the case, it is argued that, although the fall might have been involuntary, the means which he selected would be voluntary, and the injury following could not be held to have been occasioned by external, violent, and accidental means. * * *

"Now, extending the doctrine of this latter case to what might have happened with Blum, if he deliberately placed himself in a position where he would fall, realizing that such would be the result of his act, then it could not be said that his injury came about through external, violent, and accidental means within the terms of the policy; this because the act would be voluntary and deliberate, and the result could not have been unforeseen. But if he voluntarily placed himself in a position of danger, even recklessly though it may have been, and through accident, by misstep or miscalculation, or through the force of gravity not anticipated or foreseen, and was precipitated from the window ledge, the cause of the injury would have been through accidental means within the meaning of the policy."

See, also, opinion of this court in Wells Fargo Bank & Union Trust Co. v. Mutual Life Ins. Co., 66 F.(2d) 890, 895.

With the cause of death established, and with the aid of the well recognized presumption against suicide (22 C. J. 95), the plaintiff had established a prima facie case to go to the jury. Defendant, to offset any inference that death may have been occasioned by accidental means and to overcome the presumption against suicide, offered in evidence the record of the coroner's inquest, by statute made "prima facie evidence * * * of the facts therein stated" (St. Cal. 1929, p. 602), and testimony to show a motive for, and an intent to commit, self-destruction.

Unless there is no reasonable hypothesis other than suicide to be deduced from the evidence submitted, the question of the occasion of death by accidental means remains one for the jury to determine. Pythias Knights' Supreme Lodge v. Beck, 181 U. S. 49, 21 S. Ct. 532, 534, 45 L. Ed. 741; Mutual Life Ins. Co. v. Gregg (C. C. A.) 32 F.(2d) 567; U. S. Fidelity & Guaranty Co. v. Blake (C. C. A.) 285 F. 449; U. S. Fidelity & Guaranty Co. v. Blum, supra.

Unless it can be said that the expressions of the decedent to the effect that she was going to commit suicide, taken in connection with all other facts and circumstances in the case, leave no other reasonable conclusion than that of suicide, it was a case for the jury. Expressions of this kind are not of themselves controlling. The evidentiary weight to which they are entitled is very largely, if not entirely, dependent upon the character of the individual making the same. There is probably nothing more difficult than a correct diagnosis of human character. Some individuals may frequently make threats to take their own lives or those of others, and the likelihood of such threats being carried out be highly improbable. Upon the other hand, some persons most likely to carry out a formed idea may never express the same in advance of the act.

Excepting the expressions of the deceased in the nature of threats of suicide, the other facts and circumstances of the case are consistent with the theory of death by accidental means. People sometimes do lean out of windows too far and fall therefrom when there is little or nothing to suggest a motive of self-destruction. The circumstance of the fleet coming into the Bay of San Francisco and its possible limited observance from the window with a broader view by leaning out, presents for consideration whether that situation may not have occurred. With the possible exception of a hat the deceased was fully dressed for leaving the apartment, if such may have been her purpose. She left no written notes or messages, which not infrequently is the act of one about to commit suicide. Pilot Life Ins. Co. v. Wise (C. C. A.) 61 F.(2d) 481. The situation here is not similar to those cases in which death has been held as a matter of law to be the result of suicide, for in those cases no other reasonable hypothesis of death, other than self-destruction, was shown. New Amsterdam Cas. Co. v. Breschini (C. C. A.) 64 F.(2d) 887; Mutual Life Ins. Co. v. Gregg, supra.

We think it may not be said that the facts of this case point any more unerringly to suicide than did the facts considered by this court in the case of Supreme Lodge K. P. v. Beck, 94 F. 751, and by the Supreme Court in that case upon appeal. Pythias Knights' Supreme Lodge v. Beck, supra. In that case no one witnessed the shooting of Beck, who died as the result of a gunshot wound inflicted by a gun carried in his own hand. In that case also there was a coroner's verdict of suicide. While there was no express utterance of an intent to take his life, there were expressions such as "a man that has as much trouble as he had, the sooner the end came the better," and "a man 'would be better off dead than living.'" Two guns kept in his house were concealed by the domestic then employed by direction of his wife. There were no powder marks on the face, as there would have been had the gun not been held close to the skin. Commenting upon the facts of that case the Supreme Court in its opinion said:

"The discharge of the gun may as well have happened from the careless conduct of a drunken man as from an intentional act. At any rate, the question was one of fact, and the jury found that he did not commit suicide, and after its finding has been approved by the trial court and the court of appeals we are not justified in disturbing it."

The facts and circumstances disclosed by the record presented a case for the jury to determine whether the insured came to her death by accidental means, or whether it was suicide.

Judgment affirmed.