## GAMER v. NEW YORK LIFE INS. CO.

### SAME v. PRUDENTIAL INS. CO. OF AMERICA.

### No. 7392.

Circuit Court of Appeals, Ninth Circuit.
April 5, 1935.

544

Carl J. Christian and William Meyer, both of Butte, Mont., for appellant.

Kremer, Sanders & Kremer, J. Bruce Kremer, L. P. Sanders, and Alf. C. Kremer, all of Butte, Mont., for appellee Prudential Ins. Co.

W. D. Kyle and Charles R. Leonard, both of Butte, Mont., for appellee New York Life Ins. Co.

Before WILBUR and DENMAN, Circuit Judges.

WILBUR, Circuit Judge.

■ These actions were brought to recover double indemnity provided by life insurance policies in the event the insured died as result of accident. The insurance companies admitted liability for the face of the policies, but contended that the insured committed suicide. The trial judge instructed the jury to find in favor of the insurance companies upon this issue. The question for our consideration is whether or not the death of the insured can be accounted for upon any reasonable hypothesis other than suicide. Connecticut General Life Ins. Co. v. Maher (C. C. A.) 70 F.(2d) 441, 445.

■ In determining whether or not the evidence is sufficient to submit the case to the jury, we must assume that the jury will take the view most favorable to the appellant. The evidence as to the means of death is entirely circumstantial. Under the evidence, the jury would have been justified in finding that there was no motive for suicide. The insured was 51 years of age, in robust health, in reasonably good financial circumstances, was living in his own home with his wife and a daughter aged about 14. On the morning of his death, he had assisted his wife in her domestic tasks, and had been in a cheerful frame of mind, laughing and talking with his daughter a few minutes before he went to his room. He had expressed his intention of going fishing, had

dressed in his hunting clothes, as was his custom. About half an hour later his body was found in his bedroom, the legs extending into a closet where he kept his shotgun, rifle, and revolver. A rifle was grasped in his left hand, his right hand was at his side; the bridgework in his lower jaw had been thrown forward so that the rear part of the bridgework was projecting from his mouth, his upper denture, a full plate, was lying on the floor just inside the closet; his eyeglasses were lying near it; the back of the head had been entirely blown out, the opening being about three inches in diameter. There was no trace of bullet or powder marks upon the face and no point of entry of the bullet shown upon the body, leading irresistibly to the conclusion that the muzzle of the gun was in the mouth of the deceased at the time the rifle was discharged. A bullet hole was found in the ceiling of the closet, almost immediately over the feet of the body. This bullet hole was of larger diameter than the bullet; some witnesses placing its dimensions as the size of a 25-cent piece.

The closet was long and narrow, 2′ 3½″ wide and 8′ long. Extending lengthwise of the closet was a shelf under which hung a pole which was filled with hangers containing various suits, overcoats, etc. Along the wall were hooks which were hung with clothing and other articles, which, together with the clothes on the pole, completely filled the closet and made it difficult to move in it. The gun was kept in the inner end of the closet. Decedent was a large man, about 5′ 10″ tall, weighing 175 pounds. The rifle was a high-powered .300-caliber Savage. The hammer is inside and automatically cocked by the drop of the ejecter and reloader handle. This is on the underside of the rifle, forming the trigger guard, and extending under the grip.

■ The theory of the appellees is that the insured leaned over so that he was facing downward with the muzzle of the gun in his mouth and pulled the trigger of the gun with his left hand, the bullet passing through the head directly upward and in a straight line through the ceiling of the closet. The appellant's theory is that the deceased, who was a large man, after entering the closet, reached forward, grasped the muzzle of the rifle and pulled it toward him; that in doing so he came in contact with the clothes that were hanging in the closet; that he was compelled to stoop over because of the shelf in the closet, and that while in this position

he pulled the gun toward him; that the trigger became entangled in the clothing; that as he jerked the gun to release it from the clothing the muzzle entered his open mouth and the gun was discharged. The most improbable phase of this assumption is that the deceased happened to have his mouth open at the time he jerked the gun toward him. We think, however, that this conclusion is unnecessary to the hypothesis. The upper lip of the deceased showed an abrasion on the outer and inner sides which might have been caused by the sight of the rifle. A man's teeth would ordinarily prevent the muzzle of a rifle from entering his mouth without breaking the teeth, but in this case the insured had no upper teeth, and the denture was held in place merely by suction; a sharp blow would cause the denture to detach itself from the roof of the mouth and thus form no substantial obstacle to the penetration of the mouth with the muzzle of the gun. If we assume that this occurred and that the trigger had become entangled with clothing which caused the rifle to discharge when it was jerked toward the insured, it yet remains to account for the position of the bullet hole in the ceiling. If it were assumed that the rifle was being pulled toward the deceased in an angle but slightly divergent from the horizontal, it is clear that the bullet hole in the ceiling would not be in a direct line with the muzzle of the gun. There was no expert testimony with reference to the matter, but we can take judicial notice of the fact that a rifle ball striking a smooth surface at a slight angle would ricochet, and that this ricochet will not be in the same plane in which the bullet was moving at the time it struck the smooth surface, but will divert therefrom at an angle, due to the fact that the rifle bullet is not only moving forward but is rapidly revolving on its longitudinal axis. The inside of the skull would furnish such a surface. A single hole in the ceiling of the closet would not indicate the position of the gun or the insured's head at the time of the discharge. The size of the bullet hole would make it clear that it did not strike the ceiling perpendicularly, for in such case the size of the bullet hole would be the same as the caliber of the rifle, .3 of an inch, unless it be assumed that the bullet mushroomed as result of the contact with the skull of the deceased. There is no evidence that under such circumstances such a bullet would mushroom. If the evidence had shown the point at which the bullet struck the room or some other point of

the building, we then have the line of flight of the bullet after it left the decedent's head. The bullet was not discovered nor was any other mark or bullet hole found.

In considering whether or not death was suicidal or accidental, it should be observed that the preparations made by the insured for his fishing trip are entirely inconsistent with the idea that he was contemplating suicide, unless we assume that the deceased was deliberately intending to create the semblance of an accident with a view to assisting his widow in the collection of double indemnity upon his insurance policy. If such was his purpose, it would seem that a person of reasonable intelligence would realize that a much more plausible appearance of accident could be simulated somewhere on the proposed fishing trip than in the small closet where the direction of the bullet could be readily traced.

We conclude that the circumstances were such that the jury should have been left to determine whether or not the death was accidental, under appropriate instructions.

Judgments reversed.