## EQUITABLE LIFE ASSUR. SOC. OF THE UNITED STATES v. SALMEN.

No. 7905.

Circuit Court of Appeals, Fifth Circuit.

Jan. 24, 1936.

Rehearing Denied Feb. 21, 1936.

SIBLEY, Circuit Judge, dissenting.

Wm. H. Watkins, of Jackson, Miss., and Sidney C. Mize, of Gulfport, Miss., for appellant.

Stanford E. Morse and W. H. White, both of Gulfport, Miss., and Arthur A. Moreno, of New Orleans, La., for appellee.

Before FOSTER, SIBLEY, and HUTCHESON, Circuit Judges.

HUTCHESON, Circuit Judge.

Salmen, as absolute assignee of Salmen Home Lumber Company, beneficiary in two policies on the life of Walter F. Pratt, brought this suit to recover $40,000, the double indemnity provided in them for

death from accident.[1] He alleged Pratt's death, his ownership of the policies, their provision to pay $40,000 in the event of death, and $40,000 more in the event the death was from accident. That the defendant had paid $40,000, but had declined to pay the additional $40,000 for accidental death. He alleged that Pratt came to his death as the result of the accidental collision on a crossing of his automobile with a railroad locomotive.

Defendant pleading that it was not indebted, and had not promised as alleged, gave notice under the general issue that it would offer evidence to prove (1) that Pratt's death was within the policy terms caused by self-destruction, in that he deliberately and voluntarily, and for the purpose of destroying his life, drove in front of a moving train; (2) that his death was proximately caused by his willfully driving on the tracks, in violation of section 6124, Mississippi Code, without first stopping at a distance of not less than ten nor more than 50 feet from the tracks, and looking for the train.

At the close of the testimony which showed that Pratt drove on to the crossing of the Old Highway No. 49 with the G. & S. I. Railroad about one mile north of Star and seventeen miles south of Jackson, as the north-bound passenger train was coming up, and was killed there in the resulting collision, defendant moved for an instructed verdict. The District Judge thought the evidence as a whole required a jury verdict on whether Pratt's death was from accident, or was caused by his voluntary act, or by violation of law. He declined defendant's request for peremptory instructions. In a carefully prepared charge he sent the case to the jury. The verdict went for plaintiff. There was judgment on the verdict. This appeal followed.

Three grounds for reversal are put forward: (1) The one mainly relied on and most vigorously argued, the refusal to instruct for defendant. (2) The use of this language in the general charge: "Unless you believe from a preponderance of the evidence in this case, that the deceased committed suicide, you will find for the plaintiff on that issue."

Upon plaintiff's excepting to this language, the court, in the presence of the jury, said: "This instruction should be taken together with all other instructions in the case. No instruction should be singled out by the jury, but the instructions should be considered together."

(3) The refusal of the court to give defendant's requested instruction on voluntary and reckless exposure to danger, and the remarks made by the court in refusing it. This is the instruction: "If you believe from the evidence in this case that the decedent voluntarily and recklessly exposed himself to the hazards of a moving train under such circumstances as that a reasonably prudent person should have anticipated the probability that a collision would ensue from such exposure, you will return a verdict for the defendant although you may not believe that the decedent intended to commit suicide."

This is the colloquy which followed its request:

"The Court: I gave it in that language, did I not?

"Mr. Watkins: You did not. It was more complicated.

"The Court: I think my language is a little better than that. Here is what I said to the jury:

"If you believe that the defendant voluntarily and recklessly exposed himself to needless danger on the occasion of his death, you will find for the defendant, but mere negligence or inadvertence on his part at the time of the injury, is not sufficient to defeat the plaintiff's right to recover."

"My idea was that if the deceased was engrossed in some thought, and was driving down and neither saw the train nor heard it, and went upon the track in that way, he could not be held to a reckless and voluntary exposure to needless danger."

---

[1]"Double Indemnity for Death from Accident.

"And the Society agrees to increase the face amount payable under said policy to Fifty Thousand Dollars, upon receipt of due proof of the Insured's death from accident as defined below.

"Death from accident means death resulting solely from bodily injuries caused directly, exclusively and independently of all other causes, by external, violent and purely accidental means and ensuing within ninety days of such injuries, but does not include death resulting from or caused directly or indirectly by self-destruction, sane or insane * * * or by the Insured's violation of any law."

"We except to that statement of the law and to the failure to give our instruction in the exact language we asked it."

Viewed objectively and as a whole, that is, taken at its face as it was testified to by the witnesses, the direct evidence as to Pratt's circumstances and situation, and his actions shortly, and just before, the collision is without real conflict. Appellant, taking it that way, and insisting that there is direct, uncontradicted and unimpeached testimony of witnesses which must be accepted as proving beyond dispute that Pratt consciously willed his death, or at least with the will to die willed acts, and natural and probable consequence of which was his death, or in any event, brought his death about by violation of law, urges upon us that the case was not one for the jury.

Appellee, viewing the matter subjectively, that is, considering the evidence not merely as to what Pratt did and appeared to do, but as to what he intended, what he with intention willed to do in the light not of how what he did appeared to a particular witness, but of how reasonable men could take and apprehend it, argues that this is peculiarly a jury case. He insists that not only what Pratt said and did, but what he intended, what he willed to do, and therefore the motives prompting, the springs from which his actions flowed, are here in question. That in this case not only what Pratt did, and how he did it, but why and with what intention, and whether his death was an accident or was the natural and probable consequence of his willing to bring it about, was for the jury to say. As to the claim that Pratt violated the Mississippi Crossing Law by not stopping and looking as required, he argues that there is evidence that he stopped, and none that he did not look, within the distance the law fixes.

The evidence on which appellant relies as directly and beyond question defeating the claim of accidental death is that of four eyewitnesses to the events immediately preceding the collision. These are the engineer and fireman, Casey and Doolittle, and two negroes, Weathersby and Lewis. Because of its importance, we set out with fullness and exactness, what they testified to, and first Weathersby: "My house is about three hundred yards north of the railroad crossing at which the collision occurred. When I came out of the field that day I saw a car sitting up by that railroad crossing. At the time of the collision I was standing in my front door about 300 yards from the car and the crossing. I heard the train whistle blow after it left Star. When I first noticed the car after that it was just about at the stop sign. It moved on toward the railroad crossing. I did not see the car when it first started to move up. I looked and I saw the train coming and then I looked and saw the car driving slowly down toward the railroad crossing. The car was moving along slowly and the train was coming on blowing. The man in the car continued to drive slowly toward the crossing and stopped the car on the track as the train got near the crossing. The train was nearly at him. I couldn't tell what effort he made to get the automobile to move off the track. I couldn't tell what effort he made to stop the car before he got to the railroad. I didn't see him make any effort. When I first saw the car rolling it was between 40 and 50 feet from the right of way of the railroad, west of the stop sign. It was not then moving. All I saw immediately before the accident was the car moving slowly just above the stopsign toward the crossing. I could see the train coming and could hear the blowing. The car moved slowly down and stopped on the crossing. I could not tell how long it was after he stopped on the crossing before the train hit him. They say those signs are fifty feet from the crossing."

J. C. Lewis testified: "When that collision took place at the crossing of old #49 I was walking around that curve. When I came around the curve the car was standing right over on the righthand side under a tree and it just eased out from under it. I don't know how far that tree was from the track. The car was not far from the stop sign. The car was back this way from the stop sign but I do not know how far. I saw the car roll up there on the track. Before I heard the car roll I heard the train blowing down the railroad track. I heard the train blowing for the curve first before I heard the man starting his car. When the train blew for the curve the car rolled on the track. I didn't see the car from the time it started until it rolled on the track. I didn't see the car before it rolled on the track, it was under the tree. When it left the tree it just eased down on the track. When it got

574

on the track it stopped and then the train hit it. I said I saw the car move away from under the tree, and go toward the track. It stopped after it got on the track. There are scrub oaks and underbrush growing in there. The only part of the railroad track I could see was the crossing."

Casey the engineer testified: That the northbound G. & S. I. train reached Star at 12:21 on time and remained there just a few seconds. When he started away from Star it was still uphill for three quarters of a mile. Just as he tilted over the hill there was a slight curve to the right. When he was within a quarter of a mile of the crossing he observed the automobile standing about 150 feet from it. He checked the speed in that curve to between 20 and 30 miles an hour. He lost view of the car as he was going around the curve. About 300 feet from the crossing he did not see it any more until the fireman hollered out, "Did he get over?" the engine bell had been ringing since the train left Star. The train hit the automobile at the door opposite the place where Pratt was sitting. He could see the crossing when the engine was a quarter of a mile away, but he did not begin blowing his whistle until it was between 400 and 500 feet from the crossing. Then he blew two long and a short one and then pulled down on the cord and held it blowing all the time. When the car went out of his sight when he was about 300 feet from the crossing it had not moved.

Doolittle testified that the train was traveling about thirty miles an hour. That it had blown three times for other crossings before it reached the one in question. He was on the left-hand side of the cab and he first saw the crossing when the train was about 300 feet from it. When he got his first view of the crossing he saw an automobile rolling toward it at about eight or ten miles an hour between the crossing and the stop sign and about 25 feet from the crossing. At this time the train was about 300 feet from it. He kept the car under constant observation until it headed on to the crossing and out of his line of vision. He did not see the man in the car make any effort to stop it. The train whistle was blowing constantly and the bell was ringing. When the car passed out of his view he yelled to the engineer "Did he get across?" and shortly thereafter the train struck the car.

Appellant argues that if the record was devoid of other evidence, and particularly of the evidence as to Pratt's motive for doing so, the tale these witnesses tell means, it can mean, only one thing, that Pratt willed his death. It insists, however, that the record is replete with evidence showing the reason and motive for his having done so, completely corroborating the conclusion their testimony compels. This corroborative evidence may be briefly recited.

When found after the collision, the emergency brake of the car was set, the engine was not running, and the ignition switch was turned on. Many witnesses testified that a person looking south from the stop sign could see south down the railroad for at least a quarter of a mile. Photographs appellant offered showed a clear vision of the track. As to motive and reason, appellant proved that Pratt had at one time been a prosperous lumberman, operating a company of his own, the Home Lumber Company at Gulfport, Miss. Proved his failure in 1929 or 1930, resulting in breaking Pratt financially and in health and spirits. That some four years before his death he had moved to Jackson, where, his health improving, he had gotten one job and then another, and, finally, about two years before, had been made secretary of the Lumbermen's Association, with an expense account and a salary first of $175, later of $300 per month. It proved that about thirty days before the accident an audit had shown Pratt overdrawn $522. As the result of it, and of his failure to make it good, he was let out and another man was taken in his place. It proved the insistence of the association that he pay the money back, his efforts and failure to do so, his efforts and failure to obtain his place again, and offered witnesses who testified that he was greatly worried over the situation; that he was sick and was drinking. It proved also that he had been sitting in the car in the neighborhood of the track for more than two hours on the morning before the accident.

Appellee insists that the evidence appellant does not draw attention to counters and affords a basis for contrary inferences from those appellant would have drawn as matter of law. This consists of the evidence of Mrs. Pratt that Pratt's

health and spirits were better than they had been for some time; that both she and her son had employment, and that Pratt was pleased that they had. That he would drive her to and from work, in the morning, at lunch time and at night, and that on the morning of the accident he had taken her to work and she was expecting him back at 1. That while he had had a little bilious spell he had not been drinking and was not ill at that time. And of the testimony of the doctor who examined him after his death that he had not been drinking, and gave no evidence of the presence of any illness.

Countering the inference that he killed himself because he owed $500, appellee points to the testimony that no criminal prosecution was threatened or intended, and that Pratt had that morning telephoned the president of the association that he would be in that afternoon to straighten the overdraft up.

Countering the inference ordinarily insisted upon in these insurance cases, that the deceased killed himself to give his wife and family the benefit of his insurance, appellee points to the record that his wife had no interest in the insurance; that it was owned absolutely by Salmen, who had it by assignment from a creditor.

Countering the inference that he had waited more than two hours for the train wherewith to slay himself, appellee inquires, were there no other trains that he should wait two and a half hours for this particular one? He further points to the testimony that deceased drank corn whisky; that there was none in the house that morning, that he drew $3, the price of a gallon of corn whisky; that his car was parked near the home of a Mrs. Didlake, who sold corn whisky; that on first getting into that vicinity he had driven to her house and asked for her, and when told that she was in Jackson, had driven down to the highway and parked his car as though waiting for her.

Countering the inference that he did not stop within 50 feet of the crossing and look for the train, and that if he did, he saw it, appellee points to the conflicting character of the evidence of the witnesses as to where they saw him stop, some putting him within 50 or 60 feet, some within 150 and none of them claiming to have seen him during the whole course of his progress, and to have seen whether he did or did not stop and look.

Countering the inference that he must have seen the train, if he had stopped, plaintiff points to the testimony of the negro Lewis, that on account of the brush and trees he could not see the train, but could only see the crossing, and of other witnesses, that at that point the train could not be seen because of brush and other obstructions, and that the photographs defendant relies on did not, as they were taken, correctly reflect the view from the stop sign. Countering the comprehensive inferences on the whole case appellant would have drawn, appellee insists that within all of the authorities the case was for the jury.

■ While it may not be doubted that the point is a close and difficult one, we think we cannot say that reasonable minds could not draw the conclusion the jury did, that the death was from accident. Unlike most of the cases on which appellant relies, here the wound which caused death was admittedly inflicted, not by the deceased's own hand, but by a force not under his control or direction, but wholly external to him. In the many cases of death from gunshot wounds in which we have ruled that no case was made for the jury, the evidence made it certain that the deceased shot himself, and plaintiff's effort was to put forward some possibility or surmise that he shot himself accidentally. Here the deceased did not inflict the fatal wound. Here everything that happened could reasonably have happened without the will to commit suicide. We think that whether the death was from accident or suicide was for the jury, as it was in Mutual Life Ins. Co. v. Savage (C.C.A.) 31 F.(2d) 35; New York Life Ins. Co. v. Brown (C.C.A.) 39 F.(2d) 376; Equitable Life Assur. Soc. v. First National Bank (C.C.A.) 40 F.(2d) 817; Mutual Life Ins. Co. v. Garner (C.C.A.) 75 F.(2d) 384; Travelers' Ins. Co. v. Wilkes (C.C.A.) 76 F.(2d) 701; Fidelity & Cas. Co. of New York v. Driver (C.C.A.) 79 F.(2d) 713. Among the many others which might be cited see also Jefferson Standard Life Ins. Co. v. Jefcoats, 164 Miss. 659, 143 So. 842; Pythias Knights' Supreme Lodge v. Beck, 181 U.S. 49, 21 S.Ct. 532, 45 L.Ed. 741; Connecticut General Life Ins. Co. v. Maher (C.C.A.) 70 F.(2d) 441; Gamer v. New York Life Ins. Co. (C.C.A.) 76 F.(2d) 543.

But appellant says that the four witnesses testified to a state of facts which required a verdict either of willful self-destruction, or of voluntary exposure to a known peril, and that under our case of Arnall Mills v. Smallwood (C.C.A.) 68 F.(2d) 57 and cases cited, the testimony of these witnesses may not be rejected.

"It will serve no useful purpose to collate or discuss the authorities upon the conclusive effect of the testimony of a witness not directly contradicted. Of the multitude of them many are collected in an exhaustive note in Kelly vs. Jones, supra. In some jurisdictions the leaning is toward a jury verdict. In others, against it. In the end whether a verdict should be instructed is one for the exercise of judgment, not for the mechanical application of formulae." Gibson v. Southern Pacific Co. (C.C.A.) 67 F.(2d) 758, 762.

We think that the judgment was rightly exercised here in sending the case to the jury, for them to say, in the light of the contradictions this testimony exhibited, what was in fact, testified to, and to decide, out of all they heard, what actually happened. Besides, everything that each of these witnesses says occurred could have occurred just as he told it, without establishing, as matter of law, a voluntary exposure to known danger or self-destruction. The deceased might have started his car without hearing the train; he might have come to the crossing before he was aware of it, and suddenly seeing it, might have endeavored to stop the car, but found himself unable to do so before it rolled onto the track. There is testimony that there were skid marks on the west side of the tracks showing an effort and inability to stop. Why he stood at the crossing for two hours nobody tells. Appellant infers it was to wait for the train which would kill him. Appellee, that it was to wait for the woman who had whisky to sell. Under the evidence, can it be said that either inference would be unreasonable? All of the testimony is to the effect that no criminal proceedings against Pratt were threatened or contemplated; that his domestic relations were happy; that he had apparently made arrangements to settle the debt. If it be claimed that despondent and unhappy because he had lost his job, and unwilling to be a burden on his family, he had decided to kill himself to give them the insurance, the answer at once

occurs that the policy was payable neither to his wife nor his family, but to Salmen, a creditor, and that it is difficult to suppose that a man would kill himself for his creditor.

Passing the question of suicide, and turning to that of willful exposure to danger, it seems to us that if appellant is right that this crossing accident must be held voluntary as matter of law, few crossing collisions could be held accidental, for if due care were used none of them would occur. Policies of this kind are not written with the question of negligence or want of care in mind. They do not exclude recovery upon these considerations. They defeat recovery only where the thing which occurred was not accidental, but the reasonably probable result of a consciously willed action. It was at least for the jury to say whether Pratt knew and apprehended his danger and deliberately took it upon him, or whether he did what he did if carelessly and inadvertently, at least not willfully and with knowledge of probably fatal results. Cases supporting this view are United States Mutual Accident Ass'n v. Barry, 131 U.S. 100, 9 S.Ct. 755, 33 L.Ed. 60; Norris v. New York Life Ins. Co. (C.C.A.) 49 F.(2d) 62; Mutual Life Ins. Co. v. Sargent (C.C.A.) 51 F.(2d) 4; Wells Fargo Bank & Union Trust Co. v. Mutual Life Ins. Co. (C.C.A.) 66 F.(2d) 890; c. f. Aschenbrenner v. United States F. & G. Co., 292 U.S. 80, 54 S.Ct. 590, 78 L.Ed. 1137, holding that a stipulation for double indemnity should not be construed more strictly than other provisions of a policy.

Upon the point that the death was within the exception of a violation of law, we need not write much. For the policy made it a condition of the exception that the death be caused by a violation of law and the court submitted both whether there was a violation and whether it caused the death to the jury, and there was evidence which justified that submission. Couch, Ency. of Insurance Law, § 1236; c/f Travelers' Protective Ass'n v. Prinsen, 291 U.S. 576, 582, 54 S.Ct. 502, 78 L.Ed. 999, and cases cited.

We come now to the errors assigned on the charge. We do not think, when the charge is considered as a whole, that there was reversible error in the court's telling the jury "Unless you believe from

a preponderance of the evidence in this case, that the defendant committed suicide, you will find for the plaintiff on that issue." Over and over again the jury had it impressed upon them, in the clearest and most emphatic way, that the burden was on the plaintiff throughout to prove accidental death, and that by proof was meant that the evidence must preponderate in favor of that theory; if it did not, the verdict must go for defendant. They were specifically charged "the burden of proof is on the plaintiff to prove death from accidental means. This burden continues upon the plaintiff throughout the case, and never shifts to the defendant."

■ As to the presumption of suicide, the the court told the jury this presumption is not evidence; it is rebuttable, it yields to evidence. If it be considered that there was abstract error in giving the instruction complained of [but see Travellers' Ins. Co. v. McConkey, 127 U.S. 661, 8 S.Ct. 1360, 32 L.Ed. 308; New York Life Ins. Co. v. Ross (C.C.A.) 30 F.(2d) 80] it was not reversible error. The charge here was very different from that condemned in Travelers' Ins. Co. v. Wilkes (C.C.A.) 76 F.(2d) 701; Fidelity & Casualty Co. v. Driver (C.C.A.) 79 F.(2d) 713.

■ Neither was there reversible error in refusing defendant's charge on voluntary and reckless exposure to danger, in giving the charge, or in making the remarks the court made in regard to that charge. Indeed, we think the court's charge on that issue was in accordance with settled law.

We find no error in the judgment. It is affirmed.

SIBLEY, Circuit Judge (dissenting).

I agree that it is a reasonable theory of the evidence that Pratt, while worried and abstracted, drove upon the crossing without noticing the approach of the train and without consciously taking a risk to take which would exclude accident. But under that theory he could not have obeyed the Mississippi law which in positive terms, under penalty as for a misdemeanor, forbids anyone on the highway going upon a railroad crossing without stopping at the sign erected fifty feet from it, or between the sign and a point ten feet from the nearest track, and looking for the approach of a train. The purpose of the law is to prevent such an occurrence as this. A death while disobeying this law is clearly one "caused directly or indirectly * * * by the insured's violation of any law," which is excluded by the policy from the insurance. Travelers' Protective Association v. Prinsen, 291 U.S. 576, 577, 54 S.Ct. 502, 78 L.Ed. 999. Pratt knew the crossing was there, for he had crossed it two hours before and had been in sight of it ever since. If he had stopped and looked while approaching it, as required by the law, he must have seen the train. All the evidence indicates that he did not, and the only escape from the theory of suicide is that he did not. The verdict should have been ordered for the defendant.

On Petition for Rehearing.

PER CURIAM.

As neither of the judges who concurred in the judgment of the court in the above numbered and entitled cause is of the opinion that the petition for rehearing should be granted, it is ordered that the said petition be, and the same is hereby, denied.