## GENERAL AMERICAN LIFE INS. CO. OF ST. LOUIS, MO., v. FLOYD.

### No. 8006.

Circuit Court of Appeals, Fifth Circuit.

June 3, 1936.

W. Calvin Wells and Hubert S. Lipscomb, both of Jackson, Miss., for appellant.

J. H. Howie and W. B. Fontaine, both of Jackson, Miss., for appellee.

Before FOSTER, SIBLEY, and HUTCHESON, Circuit Judges.

HUTCHESON, Circuit Judge.

The suit was on a policy providing double indemnity for accidental death. There were two general defenses: (1) That the assured's death resulted from his violation of law in that (a) he was attempting to kill Gray, who killed him in self-defense; (b) he was engaged in an unlawful trespass; (c) he was unlawfully carrying a concealed weapon, a pistol. (2) That his death was not the result of accidental means, but of his being shot by Gray in self-defense, while as aggressor in a difficulty he had provoked, Floyd was attempting to draw his gun to kill Gray. Appellant seeks a reversal for the failure to instruct a verdict and for error in refusing a special charge.

Gray was the only eyewitness to the shooting. He testified to an unwarranted and unprovoked assault upon him by Floyd, and to his having killed Floyd in self-defense. Appellant, invoking Weathersby v. State, 165 Miss. 207, 147 So. 481, a prosecution for murder, insists that, since no one contradicted this testimony, a verdict should have been directed on it in its favor. Appellee, invoking our cases of Mutual Life Ins. Co. v. Sargent, 51 F.(2d) 4; Ætna Life Ins. Co. v. Hagemyer, 53 F.(2d) 636; Gibson v. Southern Pacific Co., 67 F.(2d) 758; and Equitable Life Assur. Soc. v. Salmen, 81 F.(2d) 571, insists that not only Gray's vital interest in exculpating himself from the charge of murder then pending, but the physical facts and conflicting witness testimony, furnish ample contradiction to take the case to the jury. These facts are: The nature and position of Floyd's dead body when found hanging from the wagon; the nature and position of the wounds which covered it; and the conflicting testimony as to whether or not he was, or could have been, carrying a pistol on his person. It is appellee's position, in short, that whether Floyd's death was accidental, or was caused by his voluntarily engaging in a difficulty from which he could reasonably have expected death would ensue, or was within the policy the result of a violation of law, was for the jury.

The shooting occurred on land, and in connection with an outhouse, owned by Floyd, adjacent to and a part of the premises of a tenant house in which Gray was actually living. One of the questions in the case was whether, when in August, 1934, Floyd took possession of the outhouse to put his tools in it, it was in the actual, rightful possession of Gray.

Gray, who had been a tenant of Floyd's for some six years on other premises, had gone onto the land in the preceding year as Floyd's tenant under a contract carrying to January, 1934. When Gray had come on the place the year before, he had collected up the landlord's tools, which the former tenant had left on the land, and had stored them in the smokehouse in which Floyd was storing his tools when he was shot. Gray testified that, when the business of 1933 was up for settlement, Floyd did not settle fully, but asked

him to stay over another year, as he had been with him a long time, saying he would be around on January 1st to make a new contract. This new contract was not made, and it is undisputed that Floyd actually regarded Gray, not as his tenant, but as a trespasser, and that, though Gray had been staying on the land, it was because he could find no other place to move to. That Floyd's claim that Gray was a trespasser, and that he had no right to be there, was not a mere pretense, but a real one, is evidenced in many ways. He had given him a written notice, dated February 9, 1934, to move, had taken away the mules he had given Gray the year before to crop the land with, had notified Gray that he was going to put the land in cultivation, and the actual difficulty occurred while Floyd was on the premises putting some tools used in working the land, in the house where Gray, when he took the place over, had the year before stored the tools.

On the question of tenant or trespasser Gray testified: "I never did admit that the lease was ended. About the first of February Floyd came to my place and I asked him to go away. He took the mules away and told me I would have to look for another place, and I began to look for another place, but up to the time of the trouble was unable to find one."

Of his failure to plant a crop in 1934, he said that under the contract Floyd was to furnish mules and supplies, and that he did not furnish either.

Plaintiff's theory was that Gray was a trespasser, wrongfully holding on to the premises after his contract had expired, without contract, or other right to do so; that Floyd, having no tenant on the place, had the right to go on it and crop it, and that not Floyd, but Gray, was a law violator in being on the premises. The defendant's theory was that Floyd had given Gray the right to continue as a tenant on the land and Floyd was a trespasser in entering.

■ We think there was ample warrant in the facts for the jury's finding that Gray had no contract or other right to be on the premises, and that Floyd was within his lawful rights when he went on them to make a crop and to store his tools in the building used for that purpose. There is no merit then in the point that a verdict should have been directed be-cause Floyd's death was as matter of law caused by his violation of law in going on the premises. The other defenses of violation of law in carrying a concealed weapon and in provoking a difficulty by assaulting Gray raise in different forms the same question, that the death was the result, not of accident, but of Floyd's wrongful and intentional conduct. This is the point of greatest seriousness, and the point on which the evidence must be most closely searched. Thus searched, it reveals discrepancies in the testimony of the witnesses as to whether Floyd had a pistol on him.

As to Floyd's carrying a concealed weapon, there is the testimony of Floyd's daughter that Floyd's pistol was in the pocket of the car when she came to the place of the shooting; the testimony of another witness that a little while before the shooting Floyd had drawn his pistol from his bosom, saying that it would be sufficient to protect him when unloading the tools, and testimony by the constable and some others that a pistol had been found on Floyd. This testimony that Floyd had a pistol on him was contradicted, not only by the testimony of Floyd's daughter, but by the way it came in and the inherent discrepancies it carried. Some said that the pistol was found by the constable after he had first placed a sheet over Floyd's body, and then gone back and raised it up to search him. Some said that the pistol was found wrapped in Floyd's bosom, some that it was found unwrapped. Some of the witnesses, including the constable, testified that he did not go to the car in which Floyd's daughter was sitting; some testified that he did. Besides these contradictions, there is the testimony of the witness who reached Floyd first, when in his shirt sleeves he was lying with his body half out of the wagon, that, though he had to put his arms around him and lift him up and lay him down again in the wagon bed, he noticed no pistol on him. And, too, there is the inherent improbability of the constable's story that, with his shirt completely open from neck to waist, a pistol could have been carried concealed in Floyd's bosom without falling out when he pitched forward after the shooting. It reveals an apparent unreasonableness in the testimony of Gray that he shot Floyd as Floyd was about to pull a pistol and shoot him, for the wounds in the side and back are not the kind that would have

been inflicted had Floyd been facing him to shoot.

To avoid the implications of the wounds, Gray testified that, as Floyd reached for his pistol and he threw his gun to his shoulder, Floyd ducked, and thus brought himself in the position he was in when shot.

Urged by the defendant, as proof of Floyd's dangerous and vicious character, in support of its theory that in violation of law he went on the premises to make an assault upon a harmless and peaceable character, the testimony of violent statements Floyd had made about Gray, and of his determination to get him off the land, including warnings and notices sent to Gray, with no violent or heady response from Gray, tended rather to support the finding of the jury that Floyd had no reason to anticipate that in going on the land to put his tools in the house he would subject himself to the danger of being shot down by Gray. Nor may it be overlooked, that, if the pistol was wrapped, as the constable said it was, it would seem unreasonable to suppose that Floyd had it there with any intention of committing an assault, or of doing more than if forced to defend himself from Gray's unlawful attacks, to resort to it in the last extremity.

The District Judge rightfully thought that all of these facts and circumstances made out a jury case. He thought that all that could be said to have been proven as matter of law was that there was bad feeling between Floyd and Gray over the premises. He reasoned correctly that this alone was not enough as matter of law to overcome the effect of the undisputed proof that Floyd was shot to death, but that it must further appear that the killing was the result of his violation of law or of acts from which he ought reasonably to have anticipated death would likely ensue. The District Judge concluded that whether Floyd had a pistol on him, whether he drew it, whether he made an effort to draw it, whether he was rightfully or wrongfully on the land; whether Gray shot him when his back was turned, or, as he claimed, shot him in self-defense while Floyd was drawing on him, whether, in short, under all the circumstances, it could be said that Floyd, in violation of law, went there to provoke a fatal difficulty and did provoke it, was a matter for the jury's decision.

We think he was right in so concluding, for, though a case of strong feeling is made out, we cannot say that reasonable minds would have been bound to conclude that Floyd's death was caused by his violation of law, or by his going to the place to provoke a difficulty, or that he should have known that he would likely be killed if he went there.

For the same reason there was no error in refusing the charge requested. In the fullest way, giving every charge the defendant requested but this one, the court submitted the theories of the defense to the jury. The court correctly declined to give the refused charge, because, though lengthily worded, it in effect directed a verdict for defendant.

The judgment is affirmed.